# CITY OF LEXINGTON et al. v. PUBLIC SERVICE COMMISSION OF KY. et al.

Court of Appeals of Kentucky.
March 28, 1952.
As Extended on Denial of Rehearing
June 20, 1952.

Foster Ockerman, Strother Kiser, Lexington, David L. Thornton, Versailles, for appellants.

Louis Cox, Frankfort, Harbison, Kessinger, Lisle & Bush, Lexington, for appellees.

CULLEN, Commissioner.

The City of Lexington and the City of Midway are appealing from a judgment of the Franklin Circuit Court that sustained an order of the Public Service Commission approving a schedule of increased rates for the Kentucky Telephone Company, which company provides telephone service in the two cities and surrounding territory.

In October 1947 the telephone company (then known as the Lexington Telephone Company) proposed the schedule of new rates here in question. Pending a determination as to reasonableness, the schedule was put into effect, as of November 21, 1947, upon the company's filing a refund bond under KRS 278.190. Protests against the new rates were entered by the Cities of Lexington, Midway and Versailles, and after hearings the Public Service Commission rejected the new rates in toto. The company brought action to review the order of the commission, and upon appeal to this Court it was directed that the case be remanded to the commission for further consideration, it being the opinion of this Court that, upon the record, the company was entitled to "some measure of relief in the way of increased rates." Lexington Tel. Co. v. Public Service Commission, 311 Ky. 584, 224 S.W.2d 423, 427.

As pointed out in the opinion on the former appeal, the telephone company, at the time the new rate schedule was put into effect, was engaged in converting its system from manual to dial operation, and it was recognized by all parties that a re-examination of the rate structure would be required when the dial system was placed in operation. The question was whether the rates were reasonable as applied to the conversion period. The conversion was completed late in 1949, and the opinion on the former appeal did not become final until December 9, 1949, so the Court took cognizance of the fact that the conversion period had ended, and pointed out that the Public Service Commission, in reconsidering the case, would no longer be required to base its decision upon estimates and expectancies, but would have before it the records of actual operation.

Upon the remanding of the case, the Public Service Commission had before it the annual reports of the company for 1947, 1948 and 1949, the monthly operating statements of the company for the period from October 1947 through January 1950, and an exhibit setting forth the comparative capitalization of the company for the years 1947, 1948 and 1949, exclusive of conversion financing. Upon this evidence, together with the evidence taken upon the former hearings, the commission found that the rates were reasonable, and approved the rate schedule.

The commission found that the net operating revenue of the company for 1947, 1948 and 1949 totalled $732,000. Debt and preferred dividend requirements amounted to $491,100 and common stock dividends at the rate of 6.8% amounted to $132,600, leaving a balance of $108,300 as a surplus available for extensions and improvements.

The debt and preferred dividend requirements were based on first mortgage bonds of $1,800,000, current borrowed debt of $1,300,000, and preferred stock of $800,000.

The commission fixed the rate base at $3,800,000, and it may be observed that the average net operating revenue for the three years in question amounted to a return of 6.4% on this rate base.

Operating expenses during the three-year period were computed at $4,033,700.

Although the appealing cities attack the rate base, the amount allowed for operating expenses, and some of the debt charges, their principal complaint seems to be that the year 1947 should not have been taken into consideration in determining the effect of the new rates, because the new rates were collected only during the last 40 days of 1947. The contention is that the surplus produced by the new rates during 1948 and 1949, whether taken by individual years or averaged, is excessive.

If the rate schedule had been intended to operate for an indefinite period in the future, and if the average surplus during 1948 and 1949 of $72,900 per year should

be considered excessive, then there would be some merit in the cities' argument. However, as pointed out above, everyone understood that the new rates were temporary in nature and were designed to apply only during the conversion period. Actually the rates remained in effect until December 6, 1950, when a new schedule was filed by the company, and it is stated in the briefs that the Public Service Commission has approved that schedule in part and no appeal has been taken from the commission's order. The reports of the company for 1950 are not in the record before us, and were not before the commission when it approved the rate schedule that we are concerned with here. We assume that the operating experience of the company during 1950 was taken into consideration by the commission when it made its determination concerning the reasonableness of the rate schedule filed in December 1950, because during that year the company had its dial system in operation, and the conversion financing was then properly to be considered in determining interest and dividend requirements.

■ We are unable to follow the cities' argument that the year 1947 should not be considered. The evidence shows that, even with the new rates being collected during the last 40 days of 1947, the company fell short by $37,500 of meeting its debt and dividend requirements. Had the new rates not been allowed, the deficit for 1947 would have been $55,800. In our opinion on the former appeal we said: "The Company made a prima facie showing of a situation where relief was necessary if its financial integrity was to be preserved, or perhaps, in the instant case, recouped." Lexington Tel. Co. v. Public Service Commission, 311 Ky. 584, 224 S. W.2d 423, 426. We can see no reason why the loss in 1947 should not be taken into consideration in determining the reasonableness of the rates during the limited period of time in which the rates were intended to apply.

Concerning the rate base, the contention of the cities is that there is no sound basis in the record for the commission's figure of $3,800,000. The commission's opinion recites: " * * * the evidence herein discloses that the net investment at original cost is around $3,200,000 and the actual net investment in the enterprise reaches some $4,300,000. Surely within the limits of these amounts a proper yardstick can be found. We are of the opinion that an amount of $3,800,000 is sufficient or at least tenable for the purpose of testing whether or not the rates under review are unreasonable. * * * "

The cities maintain that there is nothing in the record to indicate where the commission got the figure of $4,300,000 as actual net investment, and nothing to indicate what the commission means by "actual net investment" as distinguished from "net investment at original cost."

■ Regardless of the terminology employed by the commission in its opinion, we think there is reasonable support in the record for the determined rate base. There is ample evidence to support the figure of $3,200,000 as representing the net investment at original cost. In addition, the record shows that the capitalization of the company is $4,550,000. We indicated on the former appeal that the commission was required to take the capital structure into consideration in fixing the rate base. We also pointed out that reproduction costs would far exceed original cost figures less depreciation.

■ In any event, as stated by the Supreme Court in Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, rate-base theory is not as important as the results actually achieved by the rate order, and due consideration must be given to preserving the financial integrity of the utility company.

The appealing cities question the allowance, as operating expenses, of an item of $95,120 for "Extraordinary Maintenance and Repairs," and an item of $48,740 as rate case expense. The Public Service Commission directed that these items be amortized over the three-year period beginning in 1947.

■ The objection to the allowance of the item of $95,120 is based on the conten-

tion that the expenses embraced in this item were attributable to the conversion program, and therefore are not allowable as operating expenses in this rate case, but should be treated as capital investment to be taken into consideration in the future in determining the base for dial system rates. The expenses in question were mainly for replacement of station apparatus, inside wires, and drop and block wires. Witnesses for the company made some statements to the effect that these expenses were "in connection with the conversion" to dial operation, and the cities seize upon these statements as supporting their contention. However, an examination of the testimony as a whole indicates that the replacements were made "in connection with" the conversion program only in the sense that they were accelerated because of the conversion program, it being desired to place the outside plant in an improved condition preparatory to the conversion, and the replacements would sooner or later have been necessary regardless of the conversion.

As we understand the Uniform System of Accounts for Telephone Companies, which was complied with by the company in this case, items classified as "Extraordinary Maintenance and Repairs" and amortized as operating expenses over a short period of years, never will appear in the plant account, and the company never will be entitled to earn money on these items as a part of capital investment. Counsel for the cities seem to be under the impression that the item of $95,120 includes the cost of dial telephone sets, and that this cost will also be included in plant account and thus go into the rate base. Actually, the testimony of the company's auditor shows that the cost of the dial telephone sets was not included in the $95,120 item, but was carried as a separate item in the "Plant in Service" account, and was specifically excluded from the rate base during the conversion period.

We are of the opinion that the commission did not act unlawfully or unreasonably in allowing the item of $95,120 as an operating expense.

With respect to the item of $48,740 for rate case expense, the cities do not claim that, as a matter of law, rate case expense is not a proper operating expense; their contention is that there is no reference in the record to rate case expense. This contention is conclusively answered by the fact that the monthly and annual reports of the company do include the rate case expense item. For example, the monthly report for December 1949 carries, under the heading "Other Deferred Charges," the following: "Rate Case Expense......$48,738.75". The cities claim that they had no opportunity to examine the expenditures making up this item, or to enter objections to their allowance. Since the reports were on record, and the cities did not offer any evidence or raise any question as to the item, there is no basis for the claim of lack of opportunity to contest the item.

■ Some contention is made by the cities that the interest on a sum of $1,000,000 borrowed from an affiliated company should not have been included in the debt and preferred dividend requirements of the telephone company during the period covered by this litigation. The contention seems to be that the sum in question was borrowed for the conversion program, and that the company will receive duplicate reimbursement of the interest because the interest will be included in the capital costs of the conversion program as well as being charged as a debt requirement pending the conversion. As we understand the testimony for the company, the interest charges were carried only as current debt requirements, and no interest was charged in the plant account. Therefore, there seems to be no basis for the claim of duplicate reimbursement.

■■ Mention is made of the fact that upon the original hearings the Public Service Commission made a finding that the service rendered by the company was inadequate, and that this finding has not been set aside or modified. From this fact the cities appear to argue that a penalty rate should be invoked against the company. Assuming that under proper circum-

stances a penalty rate might be invoked, we are of the opinion that the question of whether such a rate should be invoked is primarily one of regulatory policy to be determined by the Public Service Commission. In this case the commission did not choose to penalize the company for its inadequate service, perhaps in the belief that the only remedy for the inadequate service was to allow the company a sufficient income to enable it to provide needed extensions and improvements. We can not substitute our judgment for that of the commission.

We are not convinced that the order of the commission is unlawful or unreasonable. Therefore the judgment is affirmed.