CITY OF COVINGTON, a Municipal Corporation of the Second Class under the laws of Kentucky, Appellant,

v.

PUBLIC SERVICE COMMISSION of Kentucky, et al., Appellees.

Court of Appeals of Kentucky.

Feb. 28, 1958.

As Modified on Denial of Rehearing

June 6, 1958.

Stanley Chrisman, Ralph P. Rich, Covington, for appellant.

Jo M. Ferguson, Atty. Gen., J. Gardner Ashcraft, Asst. Atty. Gen., Hughes, Clark & Lee, Covington, Benton, Benton, Luedeke & Rhoads, Newport, James C. Ware, Covington, George Muehlenkamp, Newport, for appellees.

CULLEN, Commissioner.

The city of Covington, Kentucky, operates a water plant which serves not only the people of the city but a substantial number of consumers outside the city limits. In City of Covington v. Sohio Petroleum Co., Ky., 279 S.W.2d 746, it was held that the rates for service to outside consumers were subject to regulation by the Public Service Commission. Accordingly, in proceedings before the Public Service Commission, an order was entered fixing a rate base for so much of the water plant as was apportionable to the outside consumers, and establishing a schedule of rates calculated to produce a fair return on the rate base. The city thereafter brought an action in the Franklin Circuit Court, under KRS 278.410, seeking to have the order vacated and set aside on the ground that it was unjust, unreasonable, capricious and unlawful. Judgment was entered upholding the order, and the city has appealed from that judgment. The appellees are the Public Service Commission and certain outside consumers who participated in the proceedings before the commission.

The first contention of the city is that the Public Service Commission unlawfully excluded from the rate base (which was determined on the original cost basis) the amount of $178,099 which represented a Federal PWA grant towards the cost of construction of the water plant. The city relies primarily upon Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, 31, 46 S.Ct. 363, 366, 70 L.Ed. 808, 812, in which the Supreme Court said:

"Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service."

Reliance also is placed on San Joaquin and Kings River Canal & Irrigation Co. v. Stanislaus County, 233 U.S. 454, 34 S.Ct. 652, 58 L.Ed. 1041; New Rochelle Water Co. v. Maltbie, 248 App.Div. 66, 289 N.Y.S. 388; Public Service Gas Co. v. Board of Public Utility Commissioners, 84 N.J.L. 463, 87 A. 651, L.R.A. 1918A, 421; and Public Utilities Commission v. Portland Water District, Maine, 76 P.U.R., N.S., 135.

None of the foregoing cases, except the one last cited, involved a federal grant, but all of them stand for the proposition, asserted here by the city, that a public utility is entitled to earn a reasonable return on the value of all property used to render service, regardless of the source of the money with which the property was acquired.

The appellees rely upon Pichotta v. City of Skagway, D.C., 78 F.Supp. 999; 76 P.U.R.,N.S., 10; City of St. Francis v. Public Service Commission, 270 Wis. 91, 70 N.W.2d 221; and Union & Jordan Irrigation Company v. Utah Public Serv-

ice Commission, 30 P.U.R.,N.S., 281. Only the last one of these cases involved directly the question of including a federal grant in a rate base, for rate-fixing purposes.

■ We are disposed to adopt the view that property purchased with the proceeds of a federal grant should be included in the rate base. For reasons it considered sufficient, the Federal Government gave the money to the city, to apply towards construction of the water plant. The city has unqualified ownership of the portion ·of the plant built with the money, and the fact that some infinitesimal portion of the money might be considered to have come from taxes paid by the out-of-city consumers does not create any equities in their favor. Certainly, if an open donation or grant (as distinguished from a consumer contribution) had come from a private donor there would be no basis upon which to bar the city from earning a return on the property purchased with the money. We see no reason for making a distinction as to a grant of money derived from taxes, so long as the money did not come primarily from taxes exacted from the very consumers who, through the rates imposed, are to pay a return to the utility upon the property purchased with the donated money.

It is our opinion that the order of the Public Service Commission excluding the PWA grant from the rate base was not lawful, and that the judgment confirming the order is erroneous to that extent. The question of whether *consumer* contributions may be included in a rate base is not before us, and we do not decide it.

The second contention of the city is that the order of the Public Service Commission is unlawful and unreasonable in that it does not permit the city to charge sufficient rates to meet the bonded indebtedness of the water plant. It is possible that when the amount of the PWA grant is added to the rate base, and an adjustment is made accordingly in the allowable return, the grounds for this objection will be dis-

sipated. However, this cannot be anticipated with absolute certainty, so we believe the question requires our consideration.

The rates fixed by the Public Service Commission would produce a net operating revenue of $52,084 for the test year 1955. The city maintains that the amount required to pay the interest and principal maturities of that portion of the water plant's bonded indebtedness for that year attributable to the property used in rendering out-of-city service would amount to $62,744, thus leaving a deficit of some $10,000. The city contends that it is required by statute to charge sufficient rates to pay the interest on the bonds and to create a sinking fund to pay the principal thereof when due, and that the Public Service Commission must allow rates sufficient for that purpose.

■ In the case of *privately-owned* public utilities, the standard theory of rate-fixing is that the rates should be so fixed that after payment of operating expenses and depreciation expense, the company will earn a net fair return on its investment. Payments of interest and principal on indebtedness must be made out of the net return, and are not chargeable as operating expenses. 43 Am.Jur., Public Utilities and Services, sec. 153, p. 672. However, in fixing the rates, some consideration will be given to the capital structure and actual capital costs of the utility. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

■■ In the case of *publicly-owned* utilities, it appears that the trend is to determine revenue requirements on the basis of actual *cash* needs. See Ohio State Law Journal, Vol. 12, No. 2, Fundamental Considerations in Rates and Rate Structures for Water and Sewage Works, Chapter 6, Determination of Annual Revenue Requirements, subdivision No. 3, Publicly-Owned Utilities, pp. 204 to 209.

Under this approach, a municipally-owned utility with a bonded indebtedness must be allowed to charge sufficient rates to meet the interest and amortization requirements of its debt. However, if the debt matures more rapidly than depreciation occurs, it may be proper to require that some of the cash realized through the depreciation expense allowance be applied toward debt amortization.

■ We believe that in the case of a utility such as the one here involved, which is publicly-owned but is serving consumers outside the ownership area, the initial approach should be to apply the customary rule applicable to privately-owned utilities, of a fair return on the investment. A problem might arise where this return would not be sufficient to meet the obligations of revenue bonds issued to finance the acquisition of property used for serving the out-of-city consumers, and by statute rates are required to be charged sufficient to retire the bonds. However, as hereinafter indicated, we do not have that problem here.

There are two kinds of bonds involved in the case before us. Some of the bonds are revenue bonds, which by their terms and by statute are payable solely out of the revenues of the water plant. In fact, the statutes require that rates be charged sufficient to pay the interest and principal of the bonds. KRS 96.430, 96.535. The amount required for interest and principal payments on these bonds, for the test year 1955, would be less than $25,000. The net operating revenue of $52,084 for that year would be more than ample to meet this requirement, so no problem exists concerning the revenue bonds.

■ The remaining bonds are *general obligation bonds* of the city, which are not a lien upon the waterworks or its revenues, and are not by their terms or by statute required to be paid out of the revenues of the waterworks. The revenues *may* be used for that purpose, but

the primary source of payment is from *taxes* levied upon the property owners within the city. If the requirements of principal and interest on these bonds are treated as cash requirements of the water plant, the revenues from the rates fixed by the Public Service Commission will not be sufficient. But we can see no basis upon which to hold that the consumers outside the city must pay these bonds.

Any time that the consumers are required to pay principal and interest on indebtedness of the utility, over and above a fair return on the investment and a reasonable depreciation expense, the effect is that the consumers are being compelled not only to pay a return on the plant property, but also to pay for the property itself. Where *revenue* bonds are outstanding, which by statute are payable out of revenues, the result may in some cases be unavoidable. But the result can be avoided in the case of general obligation bonds, because they have a primary source of payment other than the revenues.

■ The general obligation bonds may be considered to represent money borrowed by the people of the city for *equity* capital. It is up to the people of the city, and not the consumers, to pay back the money. No question of maintaining the financial integrity of the water plant is involved, because the money was not borrowed on the credit of the water plant, but on the credit of the taxpayers.

■ It is our opinion that the city is not entitled to earn any sum from the water plant, over and above a fair return on the investment, for the purpose of paying interest and principal of the general obligation bonds of the city. In this respect the order of the Public Service Commission was proper.

The order of the Public Service Commission was improper to the extent that it excluded the PWA grant from the rate base, and the judgment upholding the order is reversed to that extent, with directions

to enter judgment remanding the case to the Public Service Commission for the purpose of establishing a fair rate of return upon a rate base that includes the PWA grant. In all other respects the judgment is affirmed.