## NATIONAL–SOUTHWIRE ALUMINUM COMPANY, Appellant,

### v.

## BIG RIVERS ELECTRIC CORPORATION; Public Service Commission of Kentucky; Alcan Aluminum Corporation; Green River Electric Corporation; Meade County Rural Electric Cooperative Corporation; Henderson–Union Rural Electric Cooperative Corporation; Jackson Purchase Electric Cooperative Corporation; Commonwealth Aluminum Corporation; Willamette Industries, Inc.; Utility Ratecutters of Kentucky, Inc.; Alumax Aluminum Corporation; Firestone Steel Products Company, a division of the Firestone Tire and Rubber Company; Attorney General of the Commonwealth of Kentucky, By and Through his Utility and Rate Intervention Division; City of Hawesville, Kentucky; Hancock County, Kentucky; and Southwire Company, Appellees.

ALCAN ALUMINUM
CORPORATION, Appellant,

v.

BIG RIVERS ELECTRIC CORPORA-
TION; National–Southwire Aluminum
Company; Public Service Commission
of Kentucky; Green River Electric Cor-
poration; Meade County Rural Electric
Cooperative Corporation; Henderson–
Union Rural Electric Cooperative Cor-
poration; Jackson Purchase Electric
Cooperative Corporation; Common-
wealth Aluminum Corporation; Wil-
lamette Industries, Inc.; Utility Rate-
cutters of Kentucky Incorporated; Alu-
max Aluminum Corporation; Firestone
Steel Products Company, a division of
The Firestone Tire and Rubber Compa-
ny; Attorney General of the Common-
wealth of Kentucky, By and Through
his Utility and Rate Intervention Divi-
sion; City of Hawesville, Kentucky;
Hancock County, Kentucky; and
Southwire Company, Appellees.

Nos. 88–CA–1999–MR, 88–CA–2001–MR.

Court of Appeals of Kentucky.

Jan. 26, 1990.

Rehearing Dismissed April 18, 1990.

James Park, Jr., Katherine Randall, Brown, Todd & Heyburn, Lexington, Allison Wade, Booth, Wade & Campbell, and Caroline W. Spangenberg, Kilpatrick & Cody, Atlanta, Ga., for Nat.–Southwire Aluminum Co.

Lawrence E. Forgy, Jr., Stoll, Keenon & Park, Lexington and Richard G. Raff, Public Service Com'n of Kentucky, Frankfort, for Public Service Com'n of Kentucky.

Morton Holbrook, Ridley M. Sandidge, Jr., Lizbeth Ann Tully, Allen Holbrook, Holbrook, Wible, Sullivan & Helmers, P.S.C., Owensboro and Paul H. Keck, Michael F. Healy, and Douglas L. Beresford, Newman & Holtzinger, P.C., Washington, D.C., for Big Rivers Elec. Corp.

David C. Brown, Stites & Harbison, Louisville, and Mark R. Overstreet, Stites & Harbison, Frankfort, for Alcan Aluminum Corp.

James M. Miller, Holbrook, Wible, Sullivan & Helmers, P.S.C., Owensboro, for Green River Elec. Corp.

Frank N. King, Jr., Dorsey, Sullivan, King, Gray & Norment, Henderson, for Henderson–Union Rural Elec. Co–Op. Corp.

Paulette J. Taylor, San Mateo, Cal., William Vetter, Bethesda, Md., and Lindsey Ingram, Stoll, Keenon & Park, Lexington, for Alumax Aluminum Corp. and Commonwealth Aluminum Corp.

John S. Hoffman, Sheffer, Hoffman, Neel, Wilson & Thomason and A.M. Har-

vey, Henderson, for Firestone Steel Products Co.

John McCarty, Hawesville, for City of Hawesville, Ky.

Harold W. Newton, Hawesville, for Hancock County.

James R. Watts, Brandenburg, for Meade County Rural Elec. Co-Op. Corp.

W. David Denton, Denton & Keuler, Paducah, for Jackson Purchase Elec. Co-Op. Corp.

Wells T. Lovett, Lovett & Lamar, Owensboro, for Willamette Industries, Inc.

Don Meade, Miller and Meade, Louisville, for Utility Ratecutters of Ky., Inc.

Frederic J. Cowan, Atty. Gen., Pamela Johnson and Paul E. Reilender, Jr., Asst. Attys. Gen., Utility & Rate Intervention Div., Frankfort, for Com. of Ky. thru Utility and Rate Intervention Div.

Before HOWERTON, C.J., and WEST and WILHOIT, JJ.

HOWERTON, Chief Judge.

National–Southwire Aluminum Company (NSA) and Alcan Aluminum Corporation (Alcan) appeal from a judgment of the Franklin Circuit Court affirming an order of the Public Service Commission (PSC) in Case No. 9885. The order established fixed rates for all electric power sold by Big Rivers Electric Corporation (Big Rivers), except for the electricity sold to the two aluminum smelters. For them, the PSC established a variable electric rate, based on the fluctuating world price of aluminum. The two appeals have been consolidated for our review.

The two aluminum companies present nine allegations of error. While there are basic similarities in their arguments, each party has presented somewhat different claims of error, avoiding considerable duplication. NSA's lead argument is that the new electric rates were established to satisfy the debts of Big Rivers rather than to require its customers to pay for what was actually "used and useful" of Big Rivers' excessive generating capacity. NSA's remaining arguments are that the PSC's order is not supported by findings, that it resulted from external pressure from the Rural Electrification Administration (REA), that the order failed to follow or comply with an earlier order of the PSC, and that the variable rate is discriminatory.

Alcan's main arguments follow by attacking the use of a variable rate, which it claims (1) violates Kentucky statutes and (2) is discriminatory. Alcan also contends that the new order abandoned the standards established by the earlier PSC order without explanation or prior notice. The final argument is that the new rate abrogates Alcan's contract with the appellee, Henderson–Union Rural Electric Cooperative Corporation. When analyzing these issues, we will consolidate them as may be appropriate.

We have reviewed the essential portions of the enormous record in this case, and we have considered the excellent briefs and appendices furnished by all parties. We have also heard the oral arguments of counsel, of which we have the added benefit of a video tape recording for referral. After serious consideration of all of this data, a majority of this panel concludes that the judgment of the Franklin Circuit Court must be affirmed. The statutory duty of a reviewing court is to consider if an order of the PSC is unlawful or unreasonable. KRS 278.410. *Lexington Telephone Co. v. Public Service Commission*, 311 Ky. 584, 224 S.W.2d 423 (1949). Neither the Franklin Circuit Court nor this Court have found any clear and convincing proof that the PSC's order violated either standard.

## FACTUAL BACKGROUND

Big Rivers is a non-profit, non-stock rural electric generation and transmission cooperative which serves approximately 75,-000 customers in Western Kentucky. NSA

and Alcan are Big Rivers' two largest customers. At the time the PSC issued its order, the two smelters regularly purchased approximately 70 percent of Big Rivers' total electrical output, making NSA and Alcan dependent upon Big Rivers, and Big Rivers dependent upon the aluminum companies.

In 1980, Big Rivers applied for a certificate of convenience and necessity to construct two new coal-fired generators to be known as Wilson 1 and 2. A certificate was issued authorizing construction of both plants, and construction began on D.B. Wilson 1 on June 20, 1980. REA funded the project. Anticipated growth in Western Kentucky did not rise as expected, and it was soon determined that the load requirements for Big Rivers' service area would not need the additional capacity of Wilson 2. That portion of the project was cancelled.

As Wilson 1 neared completion in April 1984, Big Rivers filed for a rate increase with the PSC in Case No. 9006. NSA and Alcan quickly claimed that any rate increase would jeopardize their continued ability to operate. Big Rivers withdrew that rate request; but, in November 1984, it again filed for a rate increase in Case No. 9163, offering to exclude the cost of Wilson 1 from the proposed increase. The two aluminum companies again opposed this proposal, and the PSC denied any increase.

Big Rivers was unable to pay its obligations to REA, and in January 1985, REA declared all outstanding debts to be due and demanded full payment. It also instituted foreclosure action in the U.S. District Court of the Western District of Kentucky. Big Rivers' debts were approximately 1.1 billion dollars.

In October 1985, NSA filed an action with the PSC requesting a decrease in electric rates. This case was assigned No. 9437. The electric rates in 1985 were approximately 26 mils per kilowatt hour. As Big Rivers had not been allowed any rate change for several years, and since its financial fortunes were sinking, it again filed for a rate increase on August 7, 1986. The two actions, one for an increase and one for a decrease, were consolidated and designated Case No. 9613.

Wilson 1 was now complete and in operation. The foreclosure action was also pending, and Big Rivers and its creditors were attempting to negotiate a debt restructuring plan which also became a focal point of the hearing before the PSC. The purpose of the workout plan was to reduce the amounts required for debt service, to provide rates that would preserve the economic viability for the smelters, and to lead to the settlement of the foreclosure action.

The PSC denied the rate relief requested in Case No. 9613 on March 17, 1987, but at the same time, it established a new case, No. 9885, to investigate Big Rivers' wholesale electric rates. Big Rivers began its efforts to prepare a revised workout plan with REA and to redetermine its needs for new rates.

On July 20, 1987, Big Rivers filed with the PSC its compliance report, a business plan, and a revised workout plan, together with suggested tariffs and supporting data, and it also suggested that a variable rate be determined for the two aluminum smelters. It is interesting to note that the original idea for the variable rate was suggested by experts on behalf of the aluminum companies. The new proposed workout plan between Big Rivers and its principal creditors (REA and two New York banks) was to expire on August 10, 1987. In this plan, the creditors agreed to a debt service shortfall of 350 million dollars. Interest rates were to be lowered and payments extended over a longer term.

When the PSC established Case No. 9885, it ordered the parties to negotiate and attempt to work out a settlement. This proved to be too difficult, however, and the PSC began taking a more active role in order to strike a balance between the conflicting interests. The PSC retained a special counsel and employed experts to audit Big Rivers, NSA, and Alcan. It also retained an expert to evaluate and design appropriate tariffs for the smelters. The

hearings were held in Frankfort from August 4 through August 6, 1987.

The entire record, including the previous cases, was incorporated by reference for Case No. 9885. The PSC's order in Case No. 9613, establishing 9885, allowed four months for study and negotiation, and the order provided that fair, just, and reasonable rates would be expeditiously set at the end of that four-month period. The order in 9885 was entered on August 10, 1987, the date the proposed workout plan with the creditors was to expire.

A fact of uncertain significance, but about which NSA and Alcan complain heavily, is that on April 9, 1987, REA placed an embargo on all cooperative loans which might otherwise be available to various operations in Kentucky. This was done during the time for study and negotiation, and during the time of the pending foreclosure. The PSC acknowledged that the embargo was an external factor to be dealt with, but it also determined that the embargo was not a controlling issue. NSA sought to delay any hearing to finally resolve the question of rates until REA lifted its embargo, but the PSC denied that request.

PSC's Order in Case No. 9885

Since the order in 9885 is being challenged, it is essential for this Court to briefly summarize some of its major points. It acknowledged that the case was quite complex, that Big Rivers was in arrears on its debts by approximately 1 billion dollars, and that its assets were involved in a foreclosure action. The order expressed that the economic future of Western Kentucky was linked to Big Rivers, and the PSC indicated that the long-term existence of NSA and Alcan must be considered. The PSC then sought to weigh and balance the competing and conflicting interests.

In Case No. 9613, the PSC refused to apply the concept of "used and useful" exclusively, and it did not indicate it would apply any other single, rigid standard. The controlling standard for rate determination is found in KRS 278.030(1), and that standard is "fair, just and reasonable rates."

The PSC claims that its order in Case No. 9885 attempted to balance the equities and to reach a fair, just and reasonable result. In balancing the interests, the PSC considered in No. 9613 and No. 9885 the proposed workout plan, the condition of Big Rivers, the condition of the aluminum smelters, the role of REA and the smelters in deciding to build Wilson 1, the interests of the residential and other rate payers, and the fact that Big Rivers is a cooperative owned by its members who are its customers.

The order in Case No. 9885 does not rely on cash flow targets, but on a minimum debt service schedule. The order acknowledged that REA agreed to a debt service shortfall of 350 million dollars and that the revised plan should not require additional rate increases for debt service during the term of the plan. The PSC also anticipated that off-system sales of electricity would grow and help in the payment for the system and its operation. The PSC acknowledged that the off-system projections appeared to be realistic in the new plan.

The PSC specifically "found" that the inclusion of variable aluminum smelter power rates are an important new feature which will make it more likely that the smelters will stay in business when aluminum prices are low. There was testimony in the record that a variable rate would greatly assist the smelters in weathering the down turns in the aluminum market which are an inevitable part of a highly-cyclical industry.

The PSC also found that Big Rivers' future solvency was inextricably linked to the health of the smelters. It concluded that the new rate structure provided a fair resolution of Big Rivers' financial problems and that it provided just and reasonable rates for its customers. The order clearly did not approve everything that Big Rivers requested, and we note that Big Rivers was a complainant with NSA and Alcan when the case was filed in the Franklin Circuit Court.

The PSC further found that the flexible rates were based on findings of what NSA should pay, and not on what it merely could

pay. The PSC determined that the existing rates established in 1981 were "unjust, unreasonable and insufficient."

As to the flexible rate, the PSC indicated "the rate is likely to produce, over time, the same amount of revenue that would be produced under a conventional, flat rate. NSA's witness, Dr. Howard V. Pifer III, testified that ... 'as an alternative, the commission could set innovative rates for the aluminum smelters which link electricity prices to aluminum prices'." Other witnesses also recommended the variable rate, and the PSC found that if either smelter closed due to a burdensome flat rate during a recession, the consequences for Big Rivers and the other customers would be disastrous.

In establishing a variable rate to be paid by the aluminum companies, the pivot point for electric rates was to be 32 mils. The companies would pay 32 mils per kilowatt at such times as the average world price for aluminum was 62 cents per pound. For each one cent rise in the price of aluminum, the price for electricity would rise by 0.7 mils to a ceiling of 44 mils. For each one cent fall below 62 cents per pound, the price for electricity would drop by 0.8 mils per kilowatt to a floor of 18.1 mils. These rates were less than Big Rivers had requested, but they were also higher than NSA or Alcan wished to pay.

The order encouraged Big Rivers and the aluminum companies to continue negotiations, and the PSC agreed to willingly examine any proposed changes. The order also allowed for future hearings to consider such things as inflation or deflation, and especially changes in the cost of coal.

The PSC determined that the variable rate formula should produce an excess for the minimum debt service in the early years when aluminum prices were projected to be high. The PSC anticipated that the prices would become lower in the future. The order indicated that the earlier high prices would allow some early payment of additional principal and interest. Even if aluminum prices subsequently drop, and if the debt service lags, the PSC nevertheless determined that the maximum permissible arrearages of 350 million dollars would not be exceeded. The projections for early high aluminum prices have proven to be correct. Only time will tell if the prices will substantially decrease.

The order required cooperation from all parties. The overall aim was to balance fairly the needs and interests of the generator, the customers, and the creditors. REA made significant concessions in helping to resolve the problems of Big Rivers.

The order in Case No. 9885 required that three conditions be met before it was placed into effect on September 1, 1987. First, the creditors had to accept the revised workout plan and the approved rates. Next, the foreclosure action had to be dismissed, and the creditors were required to acknowledge that Big Rivers was not presently in default. Finally, REA's embargo of financial assistance for all Kentucky cooperatives had to be lifted.

In addition to finding that the old rates were unjust and unreasonable, the PSC specifically found that the new rates are fair, just and reasonable. It also specifically found that the revised workout plan will provide a long-term resolution to Big Rivers' financial difficulties and that the economic stability of NSA and Alcan will be enhanced by the variable rates which are tied to the market price of aluminum.

Big Rivers and the aluminum companies filed a complaint in the Franklin Circuit Court challenging the order of the PSC. The Franklin Circuit Court affirmed the order, and the aluminum companies have appealed. Big Rivers is now in the posture of supporting the PSC's order.

Judge Graham of the Franklin Circuit Court is to be commended for his thorough and excellent opinion in deciding this case on August 19, 1988. We generally concur with his opinion but, as we have some differences and as the issues on this appeal have some variations, we will consider and present our reasoning for the resolution of each allegation of error.

## STANDARD OF REVIEW

As was mentioned earlier, our standard for review is set forth in KRS 278.410(1).

The statute provides that an order of the commission may be vacated or set aside only if the court finds it to be unlawful or unreasonable. The parties challenging the order have the burden of proving unlawfulness or unreasonableness by clear and satisfactory evidence. KRS 278.430. To be held unlawful, the order must violate a state or federal statute or constitutional provision, and an order is unreasonable if it is not supported by substantial evidence and the evidence leaves no room for a difference of opinion among reasonable minds. *Energy Regulatory Comm'n v. Ky. Power Co.*, Ky.App., 605 S.W.2d 46 (1980).

At the outset, we conclude that the order is fair, just and reasonable, that the findings are adequate, and that the order and new rates are supported by substantial evidence in this gigantic record. The order is not arbitrary or unreasonable. The big questions are whether the order is otherwise lawful and whether it was adopted in a lawful manner.

### THE ISSUES

Among the issues presented and remaining to be resolved are allegations that the PSC failed to follow the statutory guidelines, that it denied the aluminum companies due process of law, and that the order is discriminatory. Alcan also argues that the order abrogates its contract with Henderson–Union. Any one of these allegations, if correct, would be a challenge to the lawfulness of the order. We will consider each of these issues.

### I.

■ NSA and Alcan first argue that the PSC erred by setting rates based on Big Rivers' debts without first considering whether Wilson 1 is an excess, unneeded facility that is neither used nor useful in servicing customers. In support of this proposition, they claim that Kentucky statutes require that rates be based on a utility's property value using only the assets which are used and useful. They further allege that Kentucky case law prohibits a utility from recovering through its rate

structure the cost of property not used and useful. Another related allegation is that the PSC and the Franklin Circuit Court erred in applying a portion of the doctrine found in *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). That doctrine is that it is the result reached rather than the method employed which is controlling.

Although we believe the arguments have some basis in our public policy and precedents, we nevertheless must conclude that neither the Kentucky statutes nor Kentucky case law place such restrictions on the PSC when fulfilling its duty to establish fair, just and reasonable rates. We agree that the concept of "used and useful" has had an application in Kentucky rate making. To some extent, it appears to be part of our public policy to insure that utility consumers do not pay unreasonable rates and that utilities do not make unreasonable expansions. We do not agree with the smelters' argument, however, that somehow the historical concept of "used and useful" must be given an overriding, all-encompassing application. A determination of what is used and useful is one of many factors which should be considered when establishing rates. We also note that Kentucky has recognized and applied the *Hope* doctrine in some more recent cases. Although it may appear that the PSC put the cart before the horse when it fixed no specific value for the utility and primarily set a rate to satisfy the workout plan, we nevertheless conclude that the PSC gave adequate consideration to all applicable factors, including the used and useful facilities of Big Rivers. This very unique factual situation causes us to also conclude that the PSC must have some flexibility in its efforts to fix such rates which fairly balance the conflicting interests of the producer of electricity and the consumer.

Some states, such as Indiana and Pennsylvania, apparently continue to require establishment of rates which allow recovery only on the portion of a utility's property which is presently and almost completely used and useful. Federal cases allow individual states significant latitude in deciding

what method they choose to establish utility rates.

Our courts are not equipped to establish utility rates, and we only review the methods and results of PSC activity. Our role is to *ensure* that the rates are lawfully established and that they are fair, just and reasonable, based on the evidence. KRS 278.030(1). Our Court's role is also to insure that the conflicting interests of all parties concerned with utility rates are fairly balanced. If the PSC accomplishes this, we have no reason to substitute our judgment or reverse the PSC simply because it has failed to strictly adhere to the historical concept of "used and useful."

In Hoecher, *"Used and Useful": Autopsy of a Rate Making Policy*, 8 Energy Law Journal 303 (1987), the author of the article indicates that the concept of used and useful is still alive, but it may not be too well. Close examination of the concept and a reevaluation of its usefulness has been prompted by some failed or cancelled nuclear power plants which may or may not have been prudently constructed. In his conclusion, Hoecher wrote at 333, "... used and useful cease to deny utilities access to the ratepayer's purse simply because a utility asset was not actively employed and no immediate service or benefit was being supplied." He also concluded at 333:

> [W]hen utilities commit capital in reasonably prudent pursuit of their obligations to invest in future service and to convey benefits to future as well as present ratepayers, agencies may decide to afford rate base treatment or cost of service recovery to investments not then providing service to consumers. Such so-called departures from traditional used and useful, whether called risk allocation or something else, do not often contravene the purpose and rationale of used and useful when the interests of the ratepaying public generally are taken into account.

At 334–335, Hoecher reasoned, "[t]he flexibility inherent in the *Hope* formula translates into a myriad of ratemaking practices that will seek not only to insure an equitable exchange of value but to affect consumption, production, and distribution behaviors, and even create markets." The article concludes, at 335 with this statement: "[t]he public should indeed pay for what it gets and get what it pays for. Unless this is more precisely explained and applied, however, agencies and courts will overlook used and useful for other means to accomplish the particular end results they desire."

Although Kentucky statutes contain the term "used and useful," and some Kentucky cases have limited rates based on what was "used and useful" and not allowed recovery for much excess capacity, we do not find that our statutes and cases mandate such limitations. Indeed, they should not be construed so restrictively. A strict adherence to "used and useful" is not necessary for the courts to determine if PSC rates are lawful and reasonable. The public will be protected by judicial review, and the ultimate resulting rate should be a more important consideration than some specific, mandated method for determining it.

The controlling statutes for utility rate-making are KRS 278.030(1) and KRS 278.-270. KRS 278.030(1) authorizes utilities to collect "fair, just and reasonable rates." KRS 278.270 authorizes the PSC to "prescribe a just and reasonable rate" when it finds existing rates to be "unjust, unreasonable, insufficient, unjustly discriminatory or otherwise in violation...."

KRS 278.290 also pertains to the fixing of utility rates. The language is broad and generally permissive as to what factors to consider. The only reference to considering property which is "used and useful" is in (3). The section specifically applies to rate investigations for a utility servicing two or more municipalities, and it allows for reasonable differentials in rates between municipalities. While one might argue that the statute requires a limit on rate recovery for assets which are only used and useful, we find such an interpretation to be unnecessarily and unwisely restrictive.

Alcan attempts to carry its proposed statutory scheme a step further by arguing that the definition of a "system" in Chapter 279 limits a utility's rates to a recovery of what is used and useful. KRS 279.010(8) provides that a system "means and includes any plant, works, facilities and properties, and all parts thereof and appurtenances thereto, used or useful in the generation, production, transmission or distribution of electric energy." We find no clear reason from this definition of a co-op "system" which requires an interpretation that the PSC must value only property used and useful in setting utility rates, especially with the concept that only that property which is fully utilized may be valued.

In KRS 278.290(1), the legislature gives this guidance to the PSC in establishing value of utility property in connection with rates. It reads, in part:

In fixing the value of any property under this subsection, the commission shall give due consideration to the history and development of the utility and its property, original cost, cost of reproduction as a going concern, capital structure, and other elements of value recognized by the law of the land for rate-making purposes.

This appears to afford the PSC broad discretion in factors to be considered in ratemaking. It is certainly broad enough to consider such things as replacement cost, debt retirement, operating cost, and at least some excess capacity in order to insure continuation of adequate service during periods of high demand and some potential for growth and expansion. It also allows for consideration of whether expansion investments were prudently or imprudently made, and whether a particular utility is investor owned or a cooperative operation. Any of these factors might be extremely significant in varying situations when determining what ultimately would be a fair, just and reasonable rate and would allow for a balancing of interests.

The aluminum companies argue that Kentucky case law also prohibits a utility from recovering the cost of its property not used and useful. They cite as their leading case *Fern Lake Co. v. Public Service*

*Comm'n,* Ky., 357 S.W.2d 701 (1962). *Fern Lake* involved an investor-owned water system. It had developed a system which far exceeded what was needed. The court did declare that the excess facilities were not used and useful and did not allow them as a factor in establishing a rate base. The appellants also cite *Blue Grass State Telephone Co. v. Public Service Comm'n,* Ky., 382 S.W.2d 81 (1964), which reaffirmed *Fern Lake.*

We believe that neither case is absolutely controlling for various reasons. For one thing, they use language such as "should not include," which is substantially less than "must not include." Each case is also distinguishable in that both utilities were investor-owned rather than cooperatives, neither utility was approaching bankruptcy, and an application of the "used and useful" standard was somewhat appropriate for those cases. Kentucky is simply not shackled to a mechanical application of the used and useful standard.

We find no error by the PSC or the Franklin Circuit Court in its application of the *Hope* doctrine. In *Hope, supra,* the opinion reads, at 64 S.Ct. at 287: "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. [Citations omitted.] It is not the theory but the impact of the rate order which counts." At least two more recent Kentucky cases have cited *Hope.*

In *Commonwealth ex rel. Hancock v. South Central Bell Tel. Co.,* Ky., 528 S.W.2d 659 (1975), the court cited *Hope* and ruled at 662, "one who seeks to set aside a rate order of a public regulatory body carries a heavy burden of making a convincing showing that the order is invalid because it is unjust and unreasonable in its consequences." In *Commonwealth ex rel. Stephens v. South Central Bell Tel. Co.,* Ky., 545 S.W.2d 927 (1976), the court again cited *Hope,* and declared at 930–931, "[r]ates are non-confiscatory, just and reasonable so long as they enable the utility to operate successfully, to maintain its financial integrity, to attract capital and to com-

pensate its investors for the risks assumed...."

In developing the rates in 9885, the PSC attempted to follow the principles in *Hope*. The PSC considered the financial workout plan, the financial condition of Big Rivers, the financial condition and problems of the aluminum companies, the role of REA and the aluminum companies in the decision to build Wilson 1, the prudence of the construction of Wilson 1, the interests of the residential and other rate-payers, and the fact that Big Rivers is a cooperative owned by its members who are also its customers. The PSC specifically found that the construction of Wilson 1 was not imprudent and that:

Wilson is not a half-finished nuclear station. It is a revenue-producing, state-of-the-art coal-fire unit that may be capable in the long run of producing enough revenue as part of the Big Rivers system to repay a substantial portion or possibly all of the creditors' investment.

The PSC did not totally ignore the used and useful concept in this case. It simply refused to apply it in as strict a manner as requested by the aluminum companies. Indeed, Big Rivers is used and useful, but if it has any current problem in this concept, it is that it is capable of producing more electric energy than is presently being marketed. However, with some population growth in Western Kentucky, or the addition of another consumer such as an aluminum plant, Big Rivers would have to begin considering the construction of Wilson 2. Any time a utility, whether electric, gas, sewer or water, is only capable of producing what is demanded at peak situations, it is not capable of providing any growth potential for the area it serves. There would be no way to add an additional industry or even any substantial growth in population. Certainly, Wilson 1 is not like an incomplete nuclear plant, and it is definitely not a useless facility.

Federal decisions leave to the states the decision of what rate-setting methodology best meets individual needs, *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). As a general rule, federal law follows the *Hope* doctrine and clearly indicates the doctrinal shift away from an application of the "used and useful" theory in all cases. Federal statutory rate requirements are that rates be "just and reasonable." The opinion in *Jersey Central Power & Light Co. v. Federal Energy Regulatory Comm'n*, 810 F.2d 1168 (D.C.Cir.1987), analyzes several federal cases and then concludes at 1177:

The teaching of these cases is straightforward. In reviewing a rate order courts must determine whether or not the end result of that order constitutes a reasonable balancing, based on factual findings, of the investor interest in maintaining financial integrity and access to capital markets and the consumer interest in being charged non-exploitative rates. ... those choices must still add up to a reasonable result.

At p. 1181, the opinion reads:

[P]lacing prudent investments in the rate base would seem a more sensible policy than a strict application of "used and useful," for under this approach it is the investment, and not the property used, which is viewed as having been taken by the public. The investor interest described in *Hope*, after all, is an interest in return on *investment*.

In many rate cases, although not all, it would be more appropriate for the PSC to first determine a value for a utility before setting a rate for recovery of the investment plus operating costs. The value should not include any unreasonable, useless excesses to be borne by the consumers. While our public policy, statutes and cases clearly seek to protect consumers from paying for facilities which do not benefit them, the real goal for the PSC is to establish fair, just and reasonable rates. There is no litmus test for this and there is no single prescribed method to accomplish the goal.

The majority of this panel conclude that the PSC met the required objective and that there is no need to remand the case for additional findings. While it would be good to see more clear concern for the consumer, a clearer burden of proof on the

producer to show that the excess capacity was a prudent investment, and a clear finding of just how much excess exists, we are satisfied with the result.

Having reviewed this case thoroughly, we hold that the rates in Case No. 9885 are neither unlawful nor unreasonable. The interests of all parties are reasonably balanced. Big Rivers is alive and is providing a good, dependable electric system, which the smelters must have. There is excess capacity to provide dependable and adequate electricity at times of peak or extreme demand, and there is potential for some industrial and population growth. The consumers, who are in essence the owners in this case, are paying appropriate rates to keep the system going, and the creditors have contributed a fair share to help solve the financial crisis.

We affirm on this issue.

## II.

■ NSA and Alcan next attack the imposition of a variable rate. They argue that it violates Kentucky statutes and that it discriminates against them. We conclude that there is no statutory violation and that any discrimination is either too uncertain or that it is within acceptable limits.

The aluminum companies claim that the PSC erred not only in setting a variable rate for them, but also by establishing the rate at the wrong "pivot point." The PSC set the expected average pivot point at 32 mils per kilowatt when the average world price for aluminum is 62 cents per pound. NSA and Alcan claim that the pivot point corresponding to the price non-smelters will pay is 27.6 mils. They then argue that, over the 10-year life of the ordered rates, they will pay an extra 76 million dollars.

No one can accurately agree or disagree with these allegations, as only time will tell the accuracy of the PSC's estimates or the smelters' estimates. The variable rate depends on the current price of aluminum. If the average price over the 10-year period is under 62 cents per pound, the average rate based on the "pivot point" could be less than 27.6 mils. The variable rate

drops faster than it rises. If the price is below 62 cents per pound, the price of electricity may drop to 18.1 mils per kilowatt. Furthermore, the non-smelter ratepayers have two rate increases scheduled during the 10-year life of the order. Their final rate will be closer to the 32 mils per kilowatt.

The expert witnesses attempted to provide an average payment over 10 years to balance what the smelters and non-smelter customers pay for electricity. The variable rate was designed to require the smelters to pay more for electricity when aluminum prices are high, when they likely can afford to pay more. The variable rate will protect the smelters from high production costs when aluminum prices are low. We also note that the PSC encouraged Big Rivers and the smelters to continue to negotiate a settlement of their differences. If that does not happen, and if the variable rates prove to be unrealistic and unreasonable, the PSC may reopen the case. We find nothing unlawful or unreasonable in the order.

By selling 70 percent of its output to NSA and Alcan, Big Rivers is definitely linked to the aluminum business. The fortunes of the producer and the consumer are dependent on each other. The variable rate is a reasonable effort to protect the interests of each. As counsel for the PSC argued, the smelters and Big Rivers have been living together from the beginning, and they have now been married. In Case No. 9163 in 1985, NSA's expert witness recommended that the PSC adopt a "rate which fluctuated with the spot market price of aluminum." In 9885, the PSC agreed to do that.

Even if some discrimination actually exists, Kentucky law does not prohibit it per se. According to KRS 278.170(1), we only prohibit "unreasonable prejudice or disadvantage" or an "unreasonable difference." KRS 278.030(3) allows reasonable classifications for service, patrons, and rates by considering the "nature of the use, the quality used, the quantity used, the time when used ... and any other reasonable consideration."

Although the smelters buy electric power in large quantities, they place a big demand on Big Rivers to provide continuous uninterrupted service and to be ready to make available on demand enormous amounts of energy. Wilson 1 gives Big Rivers the ability to do this, and NSA and Alcan must help pay for it.

Perhaps the leading case on rate discrimination is *Louisville & Jefferson County Met. Swr. Dist. v. Joseph E. Seagram & Sons*, 307 Ky. 413, 211 S.W.2d 122 (1948). Several sewer customers challenged the new rates on the basis that they were discriminatory. At 211 S.W.2d 125, the opinion reads, "... if the validity of the Board's action be fairly debatable its judgment must be allowed to prevail against the objection that the classification is discriminatory." The opinion adds that the Metropolitan Sewer District was vested with legislative and administrative discretion. The PSC, likewise, has legislative and administrative discretion. Its variable rate and special classification for the smelters is fairly debatable as being sound and reasonable for all concerned. We will not disturb that decision.

### III.

NSA claims that its due process rights were violated because the PSC established the new rates under extreme external pressure from REA. NSA argues that its most essential right is to have an impartial tribunal in fact and appearance. We certainly cannot disagree, but when we consider the totality of the circumstances in this case, we need not reverse the PSC order or the Franklin Circuit Court's judgment on this ground. Likewise, we see no necessity of remanding the case for a new hearing which may or may not be capable of happening without pressure.

Certainly, there was pressure to settle this nightmare. Big Rivers was in default. REA had filed a foreclosure action, and it had placed an embargo on loans to Kentucky cooperatives. However, no one has accused the REA of any wrongdoing, as it was merely pursuing its rights as a creditor.

The potential consequences of this situation for all parties and for Western Kentucky were monstrous. We note, however, the pressure was not coming completely from REA and the circumstances created by its actions. NSA applied its own pressure with threats to close its smelter and with its letter writing and newspaper attacks.

During oral argument, we also learned that the PSC had engaged in some *ex parte* efforts to resolve the problems in this case. In some situations, such action might be condemnable, but it appears that the PSC's *ex parte* efforts were done with each of the parties, and such efforts were basically for purposes of mediation and fact finding. We find no reversible error resulting from this activity.

Although open hearings and some adjudicating are involved, rate making is basically a legislative function. *Commonwealth ex rel. Stephens v. South Central Bell Tel. Co., supra*, held that courts need not inquire into the wisdom of legislative procedures, unless they are tainted by malice, fraud or corruption. We are primarily concerned with the product and not with the motive or method which produced it. *Louisville & Jefferson Co. Met. Swr. Dist., supra*. We find no taint of fraud, malice or corruption by the PSC, and none is alleged. Rather, we should commend the members of the PSC and their counsel for the product they finally hammered out.

NSA may reasonably argue its suspicion of an impartial tribunal, but the facts just do not support any actual wrongdoing by the PSC. REA agreed to lower its interest rate and to a longer payout. The PSC withheld the rate relief until REA lifted its embargo on Kentucky loans and dismissed its foreclosure action against Big Rivers. The new rates were less than requested by REA and Big Rivers to satisfy their workout plan. There is no evidence that the order in 9885 was tainted by any special dealing between the PSC and REA, or between the PSC and any party.

We will not dispute the fact that it would have been better if the rates could have

been fixed without the atmosphere of the embargo or the foreclosure, but REA could not have been forced to drop either action. If the PSC and REA had merely remained at cross purposes, the foreclosure could have been finalized, and it is possible that the REA could have taken over the utility and fixed its own rates. *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983).

Even with pressure from all sides, the PSC wisely moved forward on schedule to obtain quick finality in establishing the rates, and it was able to balance the interests of all parties.

### IV.

■ Another *issue alleging* a denial of due process is raised by NSA and Alcan. Both argue that the PSC changed the standards for fixing rates as set out in the order for Case No. 9613 without any notice or explanation of how the rates would actually be fixed in Case No. 9885. NSA further alleges that the changes resulted from the extreme external pressure applied by REA. We disagree and find no reversible error.

This argument continues to complain about the fact that the new rates require the rate-payers to pay for the excess capacity of Wilson 1. The PSC did set the new rates high enough to give Big Rivers a reasonable chance to pay its debt to REA under the terms of the new workout plan; but, since we have already decided that neither our Kentucky statutes nor our Kentucky or federal decisions require the smelters' restricted application of "used and useful" in rate-making, we will not discuss that point again.

■ While we agree that a party is entitled to know the issues on which the decision will turn, the PSC had so many options available for rate-making that it is difficult to appreciate the charge that it changed the rules. A determination of what facilities are "used and useful" is only one of the many factors which may be considered in establishing rates.

The order in 9613 rejected the argument that rate-making is simply an exercise in applying a "used and useful" standard. NSA and Alcan were put on notice of that fact when the PSC provided, "[w]e must carry out a complex balancing of equities in allocation of risk." This is what was finally accomplished in 9885.

We also fail to see how the authorization of rates sufficient to satisfy a debt service is a total departure from precedent. Cooperative utilities are similar to publicly-owned utilities as being treated differently from for-profit, invester-owned utilities. In *City of Covington v. Public Service Comm'n*, Ky., 313 S.W.2d 391 (1958), the court wrote, at 393–394:

In the case of *publicly-owned* utilities, it appears that the trend is to determine revenue requirements on the basis of actual *cash* needs. [Citation omitted.] Under this approach, a municipally-owned utility with a bonded indebtedness must be allowed to charge sufficient rates to meet the interest and amortization requirements of its debt. [Emphasis in original.]

■ While we are aware of differences in the way this rate request has been approached in the four or five times it has been before the PSC, we find no unreasonable inconsistencies or unlawful arbitrariness. Although we expressed some criticism of the PSC's methods in this case and suggested some other methods for most utility rate-making, the PSC has many appropriate rate-making methodologies available to it, and it must have some discretion in choosing the best one for each situation. *Citizens Telephone Co. v. Public Service Comm'n*, Ky., 247 S.W.2d 510 (1952). Again, we must look more to whether the result is fair, just and reasonable rather than at the particular methodology used to reach the result.

### V.

■ The final ground for reversal is argued primarily by Alcan. It claims that the PSC made no specific findings to support its abrogation of Alcan's contract for electric service through Henderson–Union.

The contract provision for rates specified that they would be based on "the average cost of capacity and energy." Alcan argues that the new variable rate abrogates the contract and that Kentucky law requires specific findings to explain why the average cost provisions are against the public interest, citing *Pearl v. Marshall*, Ky., 491 S.W.2d 837 (1973). We find no reversible error.

Although NSA and Alcan have direct transmission lines from Big Rivers, each has a contract with a cooperative for the purchase of power. NSA buys power through Green Rivers Electric Corporation and Alcan purchases its electricity through Henderson–Union Rural Electric Cooperative Corporation. Both contracts permit the PSC to establish rates. Each contract provides in part that rates for electric service are subject "to such changes as may be authorized into effect from time to time by the Kentucky Public Service Commission."

The contracts were for 20 years and they contemplated rate changes by the PSC or changes due to a "force majeure." Furthermore, Kentucky law generally holds utility contracts are subject to rate changes ordered by the PSC, no matter what the contracts provide. *Board of Education of Jefferson County v. William Dohrman, Inc.*, Ky.App., 620 S.W.2d 328 (1981). Also, a prior approval of a contract and rate does not estop the PSC from subsequently changing the rate. *Fern Lake Co. v. Public Service Comm'n, supra.*

Although we do not agree that a rate change in this case required a "public interest" test with supporting findings, we nevertheless conclude that the PSC order in 9885 is sufficiently saturated with details and "findings" that such a test would be satisfied. The order was unequivocal about the magnitude of the problems confronting Big Rivers, the aluminum companies, and the other customers. The potential impact on the public and the entire region of Western Kentucky was identified. The economic future of the area and the joint survival of Big Rivers and the smelters was at stake. The PSC stated that its fundamental responsibility was to seek "a solution that would fairly balance the interest of all parties." We believe that the PSC's actions certainly considered and satisfied the "public interest."

The Franklin Circuit Court correctly determined that the order of the PSC in Case No. 9885 was neither unlawful nor unreasonable, and we affirm that judgment.

WEST, J., concurs.

WILHOIT, J., concurs in part, dissents in part, and files a separate opinion.

WILHOIT, Judge, concurring in part and dissenting in part.

With great reluctance I respectfully dissent in part from the majority opinion. This reluctance springs from an appreciation of the enormity and immediacy of the problem which this case presented to the Public Service Commission (PSC) and the impressive efforts of that body to reach an equitable solution, not to mention the thoughtful consideration given to those efforts by the Franklin Circuit Court and the majority here. I do so only because I believe the method by which the rates were reached appears to have failed to take into account important and well-established public policy and because of this failure, it is impossible for a reviewing court to ascertain whether the rates fixed are "unlawful or unreasonable." KRS 278.410(1).

I recognize that rate theory, in determining the value of a rate base, is not as important as the results actually achieved by the rate order. *See City of Lexington v. Public Service Commission*, Ky., 249 S.W.2d 760 (1952), *overruled on other grounds, Stephens v. Kentucky Utilities Co.*, Ky., 569 S.W.2d 155, 159 (1978). Still, the reasonableness of a rate of return to a utility cannot be decided in isolation from the rate base to which the return is applied, *see Citizens Telephone Co. v. Public Service Commission*, Ky., 247 S.W.2d 510 (1952); *Commonwealth ex rel. Hancock v. South Central Bell Telephone Co.*, Ky., 528 S.W.2d 659 (1975), so that what investment is included in the rate base, as opposed to the formula used to evaluate the

investments, is of critical importance to a proper determination of the reasonableness of a rate. What the PSC appears to have done in setting the rate base here is to have included in the base investment in property which under established public policy should not be included; although it might be argued that the PSC never did establish a rate base, but merely decided on what it was convinced was the most equitable way to retire the debt incurred by Big Rivers. *Cf. City of Covington v. Public Service Commission*, Ky., 313 S.W.2d 391 (1958). In any event, in the March 17, 1987, order it concluded, correctly I believe, that "[r]ate base and debt service coverage for a cooperative utility must be determined by applying the same standards applicable to investor-owned utilities." In fact, it would be hard to quarrel with the PSC's recitation in that order of what its guideposts should be in setting a new rate for Big Rivers. Yet the results it reached in Case No. 9885 strongly indicates that it lost sight of at least one such guidepost of particular importance.

It is "whistling in the dark" to suggest that the concept of "used and useful" is no longer of much moment in our public policy when it comes to setting utility rates. Our statutes and case law, some of which are cited by the majority, as well as a history of rulings by the PSC itself, are indicative of an established public policy that only those investments by a utility, which were prudently made and which are used and useful in furnishing service to the rate-paying public, are to be included in the rate base for fixing the rates to be charged by the utility. Accepting that the PSC has found in a somewhat converse fashion that Big Rivers has met its burden of showing the investment in the Wilson Generator to have been prudent, the inquiry must then focus on the "used and useful" requirement for inclusion of assets in rate base. From the record before us, this step in the rate-setting process appears ultimately to have been discarded by the PSC.

"[F]air, just, and reasonable rates for the services rendered," KRS 278.030(1), by a utility are not established simply by setting a rate which bankrupts neither the utility

nor its customers, the ratepayers. Just as a utility should not be denied a fair return on its investment properly included in rate base, so a customer or consumer should not be required to pay for investments made by the utility which are of no benefit to the consumer. The "used and useful" concept protects against rates based upon such "useless" investments.

"Used and useful" as it now exists in our public policy, and as it has come to be applied by our PSC and in a number of other jurisdictions, is a more flexible concept than the appellants believe. In my opinion, it would not operate to necessarily exclude from rate base any and all of the investment made in the Wilson generator. *Blue Grass State Telephone Co. v. Public Service Commission*, Ky., 382 S.W.2d 81 (1964), recognized that rate base should be "adjusted accordingly" as "the facilities purchased are not entirely usable," *id* at 82. The clear implication from this case is that such assets are includible in rate base to the extent they are "usable" for the benefit of the ratepayers. There is no dispute that all of Big Rivers' investments in generators, including the Wilson Generator, is being "used." The as yet unresolved question is the extent to which those investments are "useful." The method by which the PSC makes that determination should be left to its expertise, provided the method is fair and reasonable. *See, e.g., Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 61 Pa. Commw. 325, 433 A.2d 620 (Pa.Commw.Ct. 1981). It cannot simply disregard the "used and useful" standard in arriving at an end result which it deems reasonable.

I must confess that I am puzzled by the PSC's and the majority's fascination with *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), interpreting the "just and reasonable" standard of the federal Natural Gas Act. That case was decided almost 10 years after our statutory provision allowing "fair, just and reasonable rates" was enacted and almost 20 years before *Fern Lake Co. v. Public Service Commission*, Ky., 357 S.W.2d 701 (1962), citing

with approval *Public Service Commission v. Montana–Dakota Utilities Co.*, 100 N.W.2d 140 (N.D.1959). Simply put, the *Hope* decision has no bearing whatsoever on the "used and useful" concept which is a part of our public policy. The majority decision in *Jersey Central Power & Light Co. v. Federal Energy Regulatory Commission*, 810 F.2d 1168 (D.C.Cir.1987), not only offers no binding precedent on this question, but fails to furnish persuasive precedent as to why our policy, which forces an equal balancing of the right of the public to be served at a reasonable charge against the right of the utility to a fair return on the value of its property used in that service, should be exchanged for a policy more heavily weighted toward ensuring investors a return on their investment.

I concur with the majority that a variable rate for the appellants upon the facts presented would not be unlawful or unreasonable.

I would remand this case for a setting of rates based upon a rate base determined in accordance with the public policy of Kentucky.