Revenue CABINET, Commonwealth of Kentucky, Appellant,

v.

COMCAST CABLEVISION OF THE SOUTH; and Kentucky Board of Tax Appeals, Appellees.

Comcast Cablevision of the South, Cross–Appellant,

v.

Revenue Cabinet, Commonwealth of Kentucky, Cross–Appellee.

Nos. 2002–CA–001524–MR, 2002–CA–001579–MR.

Court of Appeals of Kentucky.

Nov. 14, 2003.

Case Ordered Published by Court of Appeals Dec. 31, 2003.

Discretionary Review Denied by Supreme Court Nov. 10, 2004.

---

Stewart Douglas Hendrix, Frankfort, KY, for appellant/cross-appellee.

Bruce F. Clark, Judith A. Villines, Stites & Harbison PLLC, Frankfort, KY, for appellee/cross-appellant.

Before EMBERTON, Chief Judge; McANULTY, Judge; and HUDDLESTON, Senior Judge.[1]

## OPINION

McANULTY, Judge.

The Kentucky Revenue Cabinet (Revenue Cabinet) appeals from the Franklin Circuit Court's opinion and order affirming the decision of the Kentucky Board of Tax Appeals (KBTA) in favor of Comcast Cablevision of the South (Comcast) on the issue of its public service corporation property tax assessment for the years 1996 and 1997. Comcast cross-appeals as to the Franklin Circuit Court's determination

---

1. Senior Judge Joseph R. Huddleston sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580. This opinion was prepared and concurred in prior to the expiration of the Special Judge assignment on November 25, 2003.

that the issues presented are purely questions of law. We affirm as to the proper standard of review and vacate and remand on Comcast's property assessment.

Comcast is a cable television company with franchises to operate in the following areas in Kentucky: Elizabethtown, Hodgenville, Campbellsville, Glasgow, Horse Cave, Cave City, Leitchfield, Clarkson and Greenville. Comcast also provides service to Tell City, Indiana and Livingston, Tennessee. In Kentucky, Comcast is subject to property taxation as a public service company under KRS 136.120(1).

Comcast's parent company acquired Telescripps Cable Company (Telescripps) when it purchased the cable television operations of E.W. Scripps Company on November 13, 1996. Thus, Comcast is Telescripps' successor in interest for the 1996 tax year. Telescripps filed a public service company property tax return for the 1996 tax year on April 30, 1996. Comcast filed its public service company property tax return for the 1997 tax year on May 28, 1997.

Comcast is required to obtain a franchise agreement from each local government prior to providing service in that area. The terms of Comcast's franchises are for a limited number of years, and renewal of the franchise is not automatic. Further, the franchises are not exclusive, and the local government may make demands on Comcast if and when the franchises are renewed. As of the 1996 tax year, which ended on December 31, 1995, the franchises of Comcast's cable systems had an average remaining life of 5.0 years. As of the 1997 tax year, the franchises had an average remaining life of 4.2 years.

The Revenue Cabinet issued amended tentative property tax assessments for the purposes of property taxation in the amounts of $49,851,803 for the 1996 tax year and $50,887,742 for the 1997 tax year.

Relying upon information provided by Comcast in its returns, information related to the sale of Telescripps, and market information reports for cable television and similar industries, the Revenue Cabinet arrived at the tax assessments under KRS 136.130(1) by determining the value of Comcast as a unit everywhere, including its Tennessee and Indiana property, and then apportioning a percentage of that unit value to Kentucky. Specifically, the Revenue Cabinet apportioned 89.6% to Kentucky for 1996 and 89.15% for 1997. The Revenue Cabinet then rounded each apportioned amount down and subtracted the assessed value of Comcast's motor vehicles to arrive at the final assessments.

Comcast timely protested the assessments. On January 14, 1999, the Revenue Cabinet issued a final ruling upholding the assessments. Comcast filed a timely appeal to the KBTA. The KBTA held a hearing on September 11 and 12, 2000.

Comcast presented three witnesses at the hearing to offer testimony in support of Comcast's contention that in assessing the property of a cable company under Kentucky's statutory scheme, the Revenue Cabinet must determine and value separately three classes of property: operating property, nonoperating tangible property, and nonoperating intangible property. Comcast's first witness was Doug McMillan, former General Manager of Comcast's Kentucky operations. In short, McMillan testified that Comcast had an antiquated system as of the lien dates at issue.

Next, John Kane, CFA, ASA, an expert television appraiser hired by Comcast, testified that he concluded that the total fair cash value of the business enterprise was $43.1 million for 1996 and $44.5 million for 1997. According to Kane, "[t]he business enterprise value is the price at which a willing buyer and a willing seller would

buy an entire business as of the date." Included in this business enterprise valuation are future values associated with future investment and future property acquisition such as an estimated $15 million cost to "wreck-out and rebuild" the current system to provide high-speed data and digital cable services. Kane termed these future values and expectations that were included in the business enterprise valuation "blue sky."

After setting the business enterprise value, Kane separated this total into "two buckets," one being the operating property and the other the nonoperating intangible property. Kane's understanding of operating property was "that property which is present and employed in the system as of the lien date or in the business as the lien date" and would include both tangible and intangible property. The intangible operating property includes the franchise. He determined that the unit value of Comcast's operating property as of the lien dates at issue was $26 million for 1996 and $23.3 million for 1997; the fair cash value of Comcast's nonoperating intangible property was $17.1 million for 1996 and $21.2 million for 1997. Kane arrived at his values by performing a discounted cash flow analysis over the remaining life of the franchises, coupled with the present value analysis of the assets in place at the end of the franchise. The following table represents Kane's classification of Comcast's property to comprise the total business enterprise value (the Kane appraisal):

| Property Classification | Fair Cash Value for 1996 | Fair Cash Value for 1997 |
|---|---|---|
| Operating Property | $26,000,000 | $23,300,000 |
| Nonoperating Intangible Property | $17,100,000 | $21,200,000 |
| TOTAL | $43,100,000 | $44,500,000 |

Kane concluded his direct testimony by stating that the KBTA should not accept the business enterprise value as the value of Comcast's operating property for purposes of taxation under KRS 136.120 because, although it includes values that investors may be willing to pay for in the marketplace, some of that value is blue sky or nonoperating intangible value. Accordingly, the business enterprise value is significantly greater than the value of the operating property as seen in the table above.

Comcast's final witness was Robert Reilly, an appraisal expert. He affirmed the Kane appraisal and discounted the Revenue Cabinet's assessment because it did not distinguish between tangible property and intangible values and further improperly characterized "blue sky" assets as tangible operating property.

Ultimately, the KBTA set aside the Revenue Cabinet's final rulings upholding the 1996 and 1997 assessments against Comcast and determined that the values reached in the Kane appraisal were proper classifications. Specifically, the KBTA concluded that the value as of December 31, 1995 (the 1996 assessment values) of Comcast's operating property was $26 million, and the value of its nonoperating intangible property was $17.1 million. The value as of December 31, 1996 (the 1997 assessment values) of Comcast's operating property was $23.3 million, and the value of its nonoperating intangible property was $21.2 million.

In setting aside the Revenue Cabinet's final rulings, the KBTA found that the Revenue Cabinet "presented no evidence to contradict Comcast's proof in support of characterizing part of its property as nonoperating intangible property, and did not

contest in any material way the manner of Kane's identification and segregation of the property, or the valuations associated with the operating portion and the non-operating portion." Further, the KBTA concluded that Comcast had met its burden of proof under KRS 13B.090(7). Finally, the KBTA held that the Revenue Cabinet's assessments included the blue sky nonoperating values.

The Revenue Cabinet appealed the decision in favor of Comcast to the Franklin Circuit Court. The Franklin Circuit Court reviewed the issue *de novo* and upheld the KBTA.

The Revenue Cabinet raises alternative arguments on appeal. The preliminary argument is that the KBTA and the Franklin Circuit Court erred in holding that the future earnings component, or blue sky, is nonoperating intangible property. In the alternative, the Revenue Cabinet contends that the KBTA's order should be reversed because it is based on testimony that lacks probative value, and it is not supported by substantial evidence in the record. As relief, the Revenue Cabinet requests that we reverse the Franklin Circuit Court and remand this case with directions that the KBTA's order be reversed and remanded to the KBTA with directions that the fair cash value of Comcast's operating property be set at the total business enterprise value established in the Kane appraisal— $43,100,000 for 1996 and $44,500,000 for 1997. In other words, the Revenue Cabinet has settled on lowering its originally assessed values; however, the Revenue Cabinet contests the property classifications reached in the Kane appraisal.

Comcast cross-appeals as to the proper standard of review. Comcast argues that this is a case about the proper assignment of a public service company's property into three classifications. Accordingly, the issue involved is a question of fact; there-fore, the appropriate standard of review is the substantial evidence standard.

■ We first address the proper standard of review. Contrary to Comcast's position, the issue presented by the Revenue Cabinet is what is the "franchise" value for purposes of the public service corporation property tax of KRS 136.120? "Franchise" is an undefined statutory term; its interpretation is a question of law. "When the outcome of a case turns on an issue of law, as in the instant matter, appellate review is *de novo.*" *Western Kentucky Coca–Cola Bottling Co., Inc. v. Revenue Cabinet,* Ky.App., 80 S.W.3d 787, 790 (2001).

■ Moreover, a question of law is also presented where the relevant facts are undisputed and the issue on appeal becomes the legal effect of those facts. *See Mill Street Church of Christ v. Hogan,* Ky.App., 785 S.W.2d 263, 266 (1990); *Western Kentucky Coca–Cola,* 80 S.W.3d at 788; *WDKY–TV, Inc. v. Revenue Cabinet Commonwealth of Kentucky,* Ky.App., 838 S.W.2d 431 (1992) (holding that issue presented was question of law where the parties agreed as to the value of the property (broadcast rights), but disagreed on the nature of the property taxed—whether it was tangible or intangible). In this case, the Revenue Cabinet and Comcast agree on the business enterprise value reached in the Kane appraisal; however, they disagree on the legal effect of the value's compilation considering Kane's explanation, the ramifications of which will be developed later in this opinion.

■ Having concluded that our review is *de novo,* we move to the Revenue Cabinet's primary argument that valuation of a franchise takes into account future income. Preliminarily, we are guided by general principles of statutory interpretation. First, it is well settled that "[i]n the

interpretation and construction of statutes, the primary rule is to ascertain and give effect to the intention of the Legislature and that intention must be determined from the language of the statute itself if possible." *Moore v. Alsmiller*, 289 Ky. 682, 160 S.W.2d 10, 12 (1942). Second, "[w]hen there is no specific statutory definition, words of a statute shall be construed according to their common and approved usage." *Kentucky Unemployment Ins. Comm'n. v. Jones*, Ky.App., 809 S.W.2d 715, 716 (1991).

Under KRS 136.120(1), "[e]very ... cable television company ... shall annually pay a tax on its operating property to the state and to the extent the property is liable to taxation shall pay a local tax thereon to the county, incorporated city, and taxing district in which its operating property is located." Operating property is defined in KRS 136.115(2) as "both the operating tangible property and the franchise, and the payment of taxes on the assessment of operating property shall be deemed the payment of taxes on the operating tangible property and the franchise." "Franchise" is not a defined term. Moreover, the public service company's property shall be further classified under KRS 136.120(2) as "operating property, nonoperating tangible property, and nonoperating intangible property." Like "franchise," "nonoperating intangible property" is also not a defined term.

Once classified, operating and nonoperating tangible property are subject to both state and local taxes; however, nonoperating intangible property is subject to a state tax rate only at the "same rate as the intangible property of other taxpayers not performing public services[.]" KRS 136.120(2). This equates to a difference in rates of 45¢ per $100 of assessed value for operating and nonoperating tangible property, to a rate which varies between 25¢ per $100 of assessed value and 1½¢ per $100 of assessed value for nonoperating intangible property.

Each public service corporation shall annually make and deliver to the Revenue Cabinet a report showing facts as requested by the Revenue Cabinet. *See* KRS 136.130. In KRS 136.130(1), the Legislature sets out some general facts that may be requested by the Revenue Cabinet in proceeding to determine the value of the operating property. Such facts include:

The name and principal place of business of the corporation; the kind of business engaged in; the amount of capital stock, preferred and common, and the number of shares of each; the amount of stock paid up; the par and fair cash value of the stock; the highest price at which the stock was sold at a bona fide sale within twelve (12) months next before December 31 of the year for which the report is required to be made; the amount of surplus funds and undivided profits; the total amount of indebtedness as principal; the cost and year acquired of all operating property owned, operated, or leased, including property under construction, property held for future use, and the depreciation attributable thereto as of December 31, the cost and year acquired of all nonoperating tangible property and the depreciation attributable thereto; the cost and market value as of December 31 of all intangible property; the value of all other assets; the operating and nonoperating revenues, the net utility operating income before and after depreciation and before and after income taxes, the net income from operations, the net income including income from investments, and income from all other sources for twelve (12) months next preceding December 31 of the year for which the report is required; the

amount and kind of operating property in this state, and where situated in each county, city, and taxing district, assessed or liable to assessment in this state, and the fair cash value thereof, the length and description of all the lines operated, owned, or leased in this state and in each county, city, and taxing district; and such other facts as the cabinet may require.

In addition to the above, the instructions given to the public service company by the Revenue Cabinet for completion of its property tax return provide additional guidance on that which comprises nonoperating intangible property:

All nonoperating intangibles of public service companies organized outside Kentucky whose nonoperating intangibles may have a commercial or business situs in Kentucky must be listed ...

(A) Give name of company and type of security, such as X Company Pfd. Stock or Y Company 1st Mortgage Bonds due 1999—Include any nonoperating copyrights and patent rights so that their taxability can be determined.

(B) Give the market value of each item. Use established market value when available. When there is no established market value, the actual market value should be estimated by the taxpayer and an explanation must be given stating the basis of the estimate.

Once the public service corporation has submitted the requested information, under KRS 136.120(3), the Revenue Cabinet has the "sole power to value and assess all of the property" of the public service corporation. As to the valuation and assessment, "[t]he Revenue Cabinet shall determine the fair cash value of the operating property of a domestic public service corporation as a unit." *See* KRS 136.160(1).

Under Ky. Const. § 172, "fair cash value" is "estimated at the price [the property] would bring at a fair voluntary sale[.]"

The crux of the Revenue Cabinet's argument is that the nonoperating intangible property identified in the Kane appraisal is actually operating property because it comprises the "franchise." As noted above, "franchise" is not a defined statutory term. Moreover, the particular property classifications designated by our legislature in KRS 136.120(2) are operating property, nonoperating tangible property, and nonoperating intangible property. In other words, "operating property" is not further broken down to the classifications of "operating tangible property" and "operating intangible property."

Although "franchise" is not a defined statutory term, Kentucky cases interpreting Kentucky Statutes (KS) 4077 and 4079, the predecessors to KRS 136.120 and KRS 136.160, respectively, aid our understanding of that which a "franchise" encompasses and how its valuation is determined. The earliest case to discuss the valuation of a "franchise" is *Henderson Bridge Co. v. Commonwealth*, 99 Ky. 623, 31 S.W. 486 (1895). Indeed, the court noted that it went into the merits of the case at some length, "knowing the importance of a correct interpretation of our existing revenue laws with reference to the taxation of the franchise of all corporations, companies, and associations operating under and enjoying the benefits of the same conferred by this state." *Id.* at 492. In *Henderson Bridge*, the state of Kentucky brought suit against Henderson Bridge seeking to recover taxes under KS 4077 on the assessed value of its franchise. Henderson Bridge defended on the ground that it did not owe any tax in Kentucky because its Kentucky franchise was of little or no value without the rights, privileges and franchises granted by Indiana, the state to which the

bridge connected. The lower court ordered Henderson Bridge to pay the tax; however, it disregarded the finding of the board of valuation and assessment and lowered the property's assessed value. From this decision, both parties appealed.

After deciding that Henderson Bridge did owe the tax, the court turned its focus to the value of the franchise and the mode and manner in which it should be assessed. *See id.* at 489. First, the court analyzed KS 4079, which established how the valuation of a franchise was to be determined by the board. KS 4079 was as follows:

> That said board from said statement [referring to a sworn statement required to be made by the president of the company] and from such other evidence as said board may have if such corporation, company or association be organized under the laws of this state, shall fix the value of the capital stock of the corporation, company or association as provided in the next succeeding section, and from the amount thus fixed shall deduct the assessed value of all tangible property assessed, in this state or in the counties where situated. The remainder thus found, shall be the value of its corporate franchise, subject to taxation as aforesaid.

*Id.* at 489.

Borrowing language from a New York appellate opinion, the court then deemed the franchise to be a company's "business opportunity and capacity." *Id.* at 489. With this in mind and after the court considered other applicable constitutional provisions and the current statutory scheme, the court held that the value of a franchise is determined by subtracting the assessed value of the tangible property from the "capital stock," which the court had previously concluded to be "the entire property, real and personal, tangible and intangible, assets on hand, and its fran-

chise as well." *Id.* at 491. Ultimately, the court reversed as to the lower court's valuation, finding that the original assessed value was proper.

In *Cumberland Telephone & Telegraph Co. v. Hopkins*, 121 Ky. 850, 90 S.W. 594 (1906), the court analyzed the many aspects of a company's franchise. Although lengthy, we set out the court's discussion in its entirety as we believe it is the seminal case on the issues before us, and both the Revenue Cabinet and Comcast have selected portions of it to support their positions:

> The main point of contention is, what is the franchise upon which these taxes are imposed? A corporation's franchise may be one thing or another. The word is not always used with reference to the same meaning. It is sometimes regarded as the mere right to be a corporation. Again, it is treated as the right to do the particular and peculiar business for which the corporation was created. It is also spoken of as the right to do its business in a certain locality, as, for example, where the Constitution requires certain franchises to be sold by cities and towns. Section 164, Const. The other two qualities of a corporate franchise may have existed before the acquisition of the latter, and are therefore in a sense quite distinct from it. For the purposes of taxation, it may be all of them and more. *Henderson Bridge Co. v. Commonwealth*, 99 Ky. 623, 31 S.W. 486, 29 L.R.A. 73. While corporate franchises have long been recognized factors of incorporated beings, they have only recently come to be regarded as separate subjects of taxation. In the rapid development of these artificial creatures of the law (corporations) as means of holding and using property in active business, the corporate franchise has come to have a recognized

value of enormous magnitude, when viewed in the aggregate. It is not the least—indeed, frequently is the greater—element of the corporation's wealth. That it should be taxed, should be made to bear its share of the public burden together with all other wealth, is fundamentally true in justice and in political economy. So far, no exact definition of it has been given upon which the courts have felt willing to finally rest the matter. And perhaps it is well enough for the present that this is so. Still certain qualities of the corporate franchise are so well known and classified as to be beyond dispute as being elements of its taxable value. The mere right to be a corporation is taxed, in the exacting of the organization tax upon its creation. This is collected once, and absolutely without reference to its property or whether it ever engages in the business contemplated by its articles. Section 4226, Ky. St.1903. The right of certain corporations to do business in a city, which it must acquire (if acquired since the present Constitution) by purchase of the franchise from the city, includes the compensation for occupying the public thoroughfares of the city. But it also may include more than that, which will be further noticed in this opinion. Each of these are qualities of the general corporate franchise. Yet, as used in the taxing statute of this state, the word has a more comprehensive meaning. It is treated as property. It is property. It adds materially to the value of the tangible property of the corporation. The right to exercise the powers allowed to the corporation by law, the peculiar and exceptional privileges it enjoys, partaking partially of the quality of sovereignty, give to its use of its tangible property, as well as to its intangible property comprised within its capital stock, a value which otherwise could not attach to

them, so that this privileged use becomes to the visible assets of the corporation what the leaven is to the loaf. While it may not be laid hold of separately, it is quite capable of being conceived and valued as a thing worth so much money. This value will depend largely upon its money-earning capacity as it may be employed, and depends at last upon its being exercised. Unless used substantially as outlined in the articles under which it is created, it could scarcely be said to have a money value at all. For, unlike tangible property, or even choses in action, it cannot be sold and trafficked in, nor consumed, nor otherwise enjoyed than in the corporate use of it. It is true that by statute, as construed by this court in *Henderson Bridge Co. v. Commonwealth*, supra, when treating of railroad corporations, the franchise is deemed to include so much of the capital of the corporation and of its other intangible assets as is represented by the difference between the total value of its money-earning capacity and the separate value of its tangible property. The franchise of a railroad company may then be accepted for purposes of taxation as the earning value ascribed to its capital by reason of its operation as a common carrier of freight and passengers. Further than that the legislation in this state on that subject has not gone.

*Id.* at 595–96.

Comcast relies on *James v. Kentucky Refining Co.*, 132 Ky. 353, 113 S.W. 468 (1908) and *Louisville Tobacco Warehouse Co. v. Commonwealth*, 106 Ky. 165, 49 S.W. 1069 (1899), for the contention that the franchise represents the added value of property that is actually employed in the public service corporation when the tax is levied. In accord, Comcast argues that the franchise value is not based upon some

speculative stock or investment price, but instead must be based on the property in use on the lien date and the earnings generated from that property. While there may be language in *James* to support Comcast's contention, the issue in this case was whether Kentucky Refining Co., a seller and manufacturer of cottonseed oil that also operated tank cars to transport the oil, was liable for the tax. Kentucky Refining Company argued that it should not have to pay the tax because owning and using the tank cars was a mere incident to its business. Upon reading *James* in its entirety, we are not persuaded that *James* stands for the proper valuation of a franchise in light of the aforementioned statutory language and cases that directly provide for the determination of the value of a corporate franchise.

Moreover, in *Louisville Tobacco Warehouse Co.,* 49 S.W. at 1070, another case cited by Comcast in support of its contention, after considering the language of KS 4077, 4078, and 4079, the court held: "it is manifest that the so-called franchise tax is in reality a property tax upon all the intangible property of the corporations named in the act." *Id.* at 1070.

■ After considering the statutory scheme pertaining to the public service corporation property tax, Ky. Const. § 172, and Kentucky case law, we conclude that for the purposes of taxation under KRS 136.120, a "franchise" is the earning value ascribed to the capital of a domestic public service corporation by reason of its operation as a domestic public service corporation. It comprises the operating property and is assessed by the Revenue Cabinet by its fair cash value as a unit. In this case, the franchise is the earning value ascribed to Comcast's capital by reason of its operation as a cable television provider. Said another way, the value of the franchise is determined by subtracting the as-

sessed value of the tangible operating property from the "capital stock," which is the "entire property, real and personal, tangible and intangible, assets on hand, and its franchise as well." *See Henderson Bridge,* 31 S.W. at 491. Thus, the business enterprise value reached in the Kane appraisal is the total of Comcast's operating property—the operating tangible property and the franchise. As assessed by Kane and agreed to by the Revenue Cabinet, it is the price at which a willing buyer would buy and a willing seller would sell an entire business as of the lien date. The fair cash value of Comcast's operating property is $43,100,000 for 1996 and $44,500,000 for 1997.

As to the other two classifications, the Revenue Cabinet relied on Comcast to inform it of any nonoperating tangible property and nonoperating intangible property that it had. Comcast concedes that it did not have any nonoperating tangible property. Accordingly, where applicable, it listed "N/A" in the space provided for nonoperating tangible property on its 1996 and 1997 tax returns. Comcast listed no property in the space provided under the "Nonoperating Intangible Property Summary." In other words, on both its 1996 and 1997 tax returns, Comcast left this provision blank, indicating it had no nonoperating intangible property.

So, if Comcast's blue sky is not nonoperating intangible property, what is nonoperating intangible property? In plain terms, it is intangible property, such as certificates of stock, bonds, or copyrights, that Comcast does not use in the provision of its cable television services.

In holding as we do, we acknowledge that courts in other states have held as Comcast urges us to hold today—"that an assessment of tangible property may properly include or reflect the values of intangibles that are deemed to be directly relat-

ed to the tangible property, but not the values of intangibles that are deemed to be related to the operation of the business enterprise in which the tangible property is used." James A. Amdur, Annotation, *Inclusion of Intangible Asset Values in Tangible Property Tax Assessments,* 90 A.L.R.5th 547, 2001 WL 871559 (2001). However, our task is to ascertain and give effect to the intention of our Legislature in enacting Kentucky's statutory scheme. While cases from other jurisdictions help aid our understanding of the issues in this appeal, they are not dispositive.

Having concluded that our review is *de novo,* we need not address Comcast's position that its classification is supported by substantial evidence in the record.

■ Since we are essentially upholding the Revenue Cabinet's assessment, we turn to Comcast's final argument that the assessment is unconstitutional because the Revenue Cabinet's assessment methodology is arbitrary, unreasonable, inequitable and without rational basis. "[I]n a taxation case, unless a rational basis for such law can be completely refuted, then the law may stand as constitutional. Notably, the burden on the ones attacking the legislative tax arrangement is the negation of every conceivable basis which might support it." *Revenue Cabinet v. Smith,* Ky., 875 S.W.2d 873, 875 (1994). On this issue, we hold that Comcast has not met its burden of negating every conceivable basis that supports the tax under KRS 136.120.

Comcast's franchises give Comcast the right to occupy the public thoroughfares of the cities in which it operates. Other domestic public service corporations also enjoying this privilege are taxed under KRS 136.120 in the same manner, thus ensuring equal application. We perceive a rational basis for the tax treatment of Comcast and other public service corporations, and Comcast has not completely refuted that

basis. *See Cooksey Brothers Disposal Co., Inc. v. Boyd County,* Ky.App., 973 S.W.2d 64, 68–69 (1997).

For the foregoing reasons, the Franklin Circuit Court's order affirming the Kentucky Board of Tax Appeals is vacated and this matter is remanded for further proceedings consistent with this opinion.

ALL CONCUR.