KENTUCKY INDUSTRIAL UTILITY CUSTOMERS, INC., Appellant

v.

KENTUCKY PUBLIC SERVICE COMMISSION and Kentucky Power Company, Appellees

NO. 2015-CA-000398-MR

Court of Appeals of Kentucky.

JULY 15, 2016; 10:00 A.M.

BRIEF FOR APPELLANT: Michael L. Kurtz, Kurt J. Boehm, Jody Kyler Cohn, Cincinnati, Ohio

ORAL ARGUMENT FOR APPEL-LANT: Michael L. Kurtz, Cincinnati, Ohio

BRIEF FOR APPELLEE KENTUCKY PUBLIC SERVICE COMMISSION: Richard G. Raff, Quang D. Nguyen, Jonathan D. Beyer, Molly Blake Katen, Frankfort, Kentucky

ORAL ARGUMENT FOR APPELLEE KENTUCKY PUBLIC SERVICE COMMISSION: Quang D. Nguyen, Frankfort, Kentucky

BRIEF FOR APPELLEE KENTUCKY POWER COMPANY: Mark R. Overstreet, Frankfort, Kentucky, Kenneth J. Gish, Jr., Lexington, Kentucky

ORAL ARGUMENT FOR APPELLEE KENTUCKY POWER COMPANY: Kenneth J. Gish, Jr., Lexington, Kentucky

BEFORE: KRAMER, CHIEF JUDGE; JONES AND TAYLOR, JUDGES.

## OPINION

JONES, JUDGE:

The Appellant, Kentucky Industrial Utility Customers, Inc., brings this appeal to challenge the Kentucky Public Service Commission's approval of Kentucky Power Company's application to recover from its customers an estimated $1.26 billion in costs associated with purchasing biomass energy from ecoPower Generation-Hazard LLC, over a twenty-year contract period. Having carefully reviewed the record and applicable legal authority, we cannot agree with the Franklin Circuit Court's opinion upholding the Kentucky Public Service Commission's decision.

While the General Assembly expressed a preference for biomass facilities located in Kentucky, its mandate to the Kentucky Public Service Commission is clear with respect to approval of cost recovery. The

General Assembly authorized the Kentucky Public Service Commission to approve recovery only if the "full costs ... over the full term" are "fair, just, and reasonable." *See* KRS [1] 278.271.

While the General Assembly's policy goals in favor of biomass energy are entitled to consideration by the Kentucky Public Service Commission, they are not a substitute for evidence supporting the overall fairness of the agreement. The Kentucky Public Service Commission must still fulfill its statutory charge to determine whether the agreement is a fair, just and reasonable one, under the circumstances. Here, there was no evidence to support a present need for biomass-generated energy, that the costs of acquiring the biomass energy under the agreement were reasonable for biomass energy (or other forms of renewable energy), or that the agreement would actually have a positive net effect on the economy of eastern Kentucky. In fact, the evidence of record is to the contrary. Because substantial evidence does not support the Kentucky Public Service Commission's decision, we must reverse the Franklin Circuit Court and remand this matter with instructions for the Kentucky Public Service Commission to deny Kentucky Power Company's application for cost recovery.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

#### 1. Kentucky Industrial Utility Customers, Inc.

The Appellant, Kentucky Industrial Utility Customers, Inc., ("KIUC"), is an association of major energy-consuming companies located in Kentucky. The member companies rely heavily on energy in their manufacturing processes. According to

---

**1.** Kentucky Revised Statutes.

KIUC, the cost of energy in our Commonwealth is one of its main priorities because it directly affects the ability of its members to remain competitive in the global marketplace. The KIUC regularly represents its members before the Kentucky Public Service Commission. The following KIUC members are located in Kentucky Power Company's service area: Air Liquide Large Industries U.S. LP; AK Steel Corporation; Air Products and Chemicals, Inc.; EQT Corporation; and Catlettsburg Refining LLC, a subsidiary of Marathon Petroleum LP.

### 2. Kentucky Power Company

The Appellee, Kentucky Power Company ("Kentucky Power), is an electric utility organized as a corporation under the laws of the Commonwealth of Kentucky. Kentucky Power is engaged in the generation, purchase, transmission, distribution, and sale of electric power. Kentucky Power serves approximately 173,000 customers in 20 counties in eastern Kentucky. Kentucky Power also supplies electric power at wholesale to other utilities and municipalities in Kentucky for resale. Presently, most of Kentucky Power's electric power is coal generated.

### 3. Kentucky Public Service Commission

The Appellee, the Kentucky Public Service Commission ("Commission"), is an administrative agency of the Commonwealth tasked with the statutory responsibility of regulating utilities and enforcing the provisions of KRS Chapter 278. Specifically, the Commission is charged with the "regulation of rates and service of utilities."

### 4. ecoPower Generation-Hazard LLC

ecoPower Generation-Hazard LLC ("ecoPower") was formed in 2009 to develop, build and operate wood-powered biomass facilities in eastern Kentucky.[2] ecoPower has plans to develop and build a 58.5 megawatt wood-powered, biomass-fired, electric-generating facility in Hazard, Kentucky. As detailed below, ecoPower and Kentucky Power reached an agreement in the spring of 2013, wherein Kentucky Power agreed to purchase all of the biomass energy generated from the proposed Hazard, Kentucky, facility. The agreement is contingent on Kentucky Power securing approval for cost recovery from the Commission. The Commission's approval of the agreement is the central issue in this appeal. However, because the application was filed by Kentucky Power as required by statute, ecoPower is not actually a named party in this litigation.

### B. Biomass Legislation

Senate Bill 46 was introduced in the Kentucky Senate on January 11, 2013, and passed by a vote of 38 to zero on February 11, 2013. The measure moved to the Kentucky House on February 12, 2013, and passed by a vote of 100 to zero on February 21, 2013. The bill declared an emergency, noting that it is vital for Kentucky to incent businesses to advance the goals of energy independence and job creation. The emergency declaration allowed the bill to become effective immediately following approval by the governor. On March 5, 2013, former Governor Steve Beshear signed Senate Bill 46 into law.

Senate Bill 46, now KRS 278.271, provides:

Notwithstanding any provision of law to the contrary, upon application by a regu-

---

**2.** Biomass is any organic biological material, derived from living organisms, that stores energy from the sun.

lated utility, the commission may allow recovery of costs which are not recovered in the existing rates of the utility for the purchase of electric power from a biomass energy facility that has received a certificate from the Kentucky State Board on Electric Generation and Transmission Siting pursuant to KRS 278.700 to 278.716. No recovery shall be allowed unless the full costs of the purchase power agreement over the full term of the agreement, which shall be included as part of the application, have been found by the commission to be fair, just, and reasonable. In determining whether the agreement is fair, just, and reasonable, the commission may consider the policy set forth by the General Assembly in KRS 154.27–020(2). The commission's approval of cost recovery under this section shall be valid for the entire initial term of the agreement.

*Id.*

KRS 154.27–020(2), which is referenced in KRS 278.271, sets forth several policy goals of the General Assembly, providing:

The General Assembly hereby finds and declares that it is in the best interest of the Commonwealth to induce the location of innovative energy-related businesses in the Commonwealth in order to advance the public purposes of achieving energy independence, creating new jobs and new investment, and creating new sources of tax revenues that but for the inducements to be offered by the authority to approved companies would not exist.

*Id.*

### C. The Agreement between Kentucky Power and ecoPower

ecoPower approached Kentucky Power about entering into an agreement to purchase its entire output of renewable energy once its proposed biomass plant in Hazard, Kentucky, was up and running. At that time, it was expected that ecoPower would be operating in the early part of 2017. Kentucky Power had not previously investigated the feasibility of increasing its power reserves through biomass power nor did it conduct any studies after ecoPower approached it.

Nevertheless, Kentucky Power believed contracting with ecoPower would be advantageous as it would allow it to increase its reserve cushion, diversify its portfolio, and begin relying more on renewable energy sources. On March 15, 2013, just ten days after Senate Bill 46 was signed into law, Kentucky Power entered into a twenty-year renewable energy production agreement ("REPA") with ecoPower for the purchase by Kentucky Power of the entire capacity value (MW), electrical output (MWh), ancillary services, and environmental attributes of the proposed Perry County ecoPower facility. [3]

Under the terms of the REPA, the price paid by Kentucky Power for the energy output generated by the biomass facility will escalate by a fixed percentage each year the agreement is in effect during its initial twenty-year term. Based upon 2012 jurisdictional revenues, Kentucky Power estimates that its revenue requirement will increase by approximately seven percent during the first year of the contract. The Commission's approval means Kentucky Power would be able to recover its costs by increasing the rates it charges its customers. The total cost of the biomass energy over the initial twenty-year period of the REPA is estimated to be $1.26 billion.

---

**3.** Under the terms of the REPA, the ecoPower Hazard facility will be connected with Kentucky Power's Engle Station by means of an approximately 1.5 mile 69 kV transmission line to be constructed and owned by ecoPower.

According to ecoPower, if the REPA is approved by the Commission, it will sell its interest in the Hazard, Kentucky, facility to Greenleaf Power LLC, a California-based owner and operator of biomass facilities. Thereafter, Greenleaf Power LLC will be the owner and operator of the Hazard, Kentucky, biomass facility.

### D. Kentucky Power's Application to the Commission

On April 10, 2013, Kentucky Power filed an application with the Commission pursuant to KRS 278.300, 807 KAR[4] 5:001 Section 14, and 807 KAR 5:001 Section 17. Specifically, Kentucky Power asked the Commission to: (1) approve the terms and conditions of the REPA with ecoPower; (2) approve and authorize Kentucky Power to enter into the REPA; and (3) declare that the concurrent recovery by means of a monthly rider or surcharge to Kentucky Power's rates of all costs associated with the REPA is appropriate. On July 3, 2013, Kentucky Power amended its application to also request approval of a "Biomass Energy Rider" that would allow Kentucky Power to recover the costs for the purchase of renewable energy under the REPA, pursuant to KRS 278.271. KIUC sought intervenor status on the basis that the Commission's approval of Kentucky Power's application could have a significant impact on the rates paid by KIUC members. The Commission granted KIUC's request.

Following extensive discovery and filing of testimony, a formal evidentiary hearing was held before the Commission on August 28 and 29, 2013. Six witnesses testified at the hearing, three on behalf of Kentucky Power, and three on behalf of KIUC. These witnesses were subject to cross-examination by the parties and the Commission.

4. Kentucky Administrative Regulations.

### E. Summary of the Evidence Presented to the Commission

#### 1. Kentucky Power's Evidence

Kentucky Power presented three witnesses in support of its application: (1) Gregory G. Pauley, Kentucky Power's President and Chief Operating Officer; (2) Ranie K. Wohnhas, Kentucky Power's Managing Director, Regulatory and Finance; and (3) Jay F. Godfrey, the Managing Director—Renewable Energy for American Electric Power Service Corporation ("AEPSC"), a wholly owned subsidiary of American Electric Power, Inc ("AEP").

#### Gregory G. Pauley

Mr. Gregory Pauley explained that Kentucky Power is a wholly owned subsidiary of AEP. As a result, he made the decision to enter into the REPA in collaboration with AEP management. Pauley testified that Kentucky Power was aware that the energy costs associated with the REPA were not the "least cost alternative to supply this capacity and energy to Kentucky Power." He further acknowledged that Kentucky Power had no present need for biomass-generated energy. However, Pauley believes that the REPA would allow Kentucky Power to increase its reserves and to diversify its energy portfolio, making it less dependent on coal.

Pauley admitted that Kentucky Power did not conduct any studies to determine whether the costs associated with the REPA were in line with other sources of renewable energy, or open the project up for competitive bidding. Nevertheless, he believes that that the REPA is in the best interest of Kentucky Power and its customers. He explained:

In light of the benefits provided under the REPA through increased fuel diversity, the use of renewable energy generation, and economic development in the Company's service territory, the eco-Power REPA is consistent with Kentucky Power's status as a public utility, and the REPA is necessary for, and consistent with, proper performance by Kentucky Power of that service to the public. The agreement will not impair Kentucky Power's ability to perform its service to the public, and is a reasonably necessary and appropriate means by which Kentucky Power may do so.

(R. at 167).

During the hearing, Pauley explained that based on the current number of residential customers and their average usage, the first-year rate increase would translate into approximately an extra $100 per residential customer. While Pauley believes the biomass facility will benefit the region due to job creation, he indicated that Kentucky Power did not study the net impact of the facility in relation to rate increases.

## Ranie K. Wohnhas

Mr. Ranie Wohnhas testified regarding the mechanism Kentucky Power proposes to use to recover the costs associated with the REPA. He explained that Kentucky Power developed a "Biomass Energy Rider" specifically to recover costs associated with the REPA. The Biomass Energy Rider provides for the concurrent recovery of Kentucky Power's costs under the REPA by means of a Monthly Biomass Adjustment Factor which would be applied to each customer's monthly energy consumption. Recovery under the Biomass Energy Rider would begin two months after Kentucky Power began purchasing output from the biomass facility. Wohnhas also testified that the REPA could potentially affect Kentucky Power's credit rating; however, he does not believe this is a true risk.

## Jay F. Godfrey

Mr. Jay Godfrey testified that one of AEP's goals is to move more toward renewable energy and, specifically, renewable energy that is generated in close proximity to its service areas. Godfrey explained that renewable energy is more expensive than other traditional forms of energy. He classified the cost of the energy under this REPA to be on the high end of the renewable energy spectrum. However, he believed it was important because it was generated from trees, an indigenous product of Kentucky.

Godfrey further explained that the energy purchased under the REPA would qualify for Renewable Energy Certificates (also known as credits), which Kentucky Power could bank or sell.[5] Godfrey stated that the REPA could be important in the future if state or federal legislation required utilities in Kentucky to generate a certain percentage of their energy from renewables.[6] Godfrey does not believe that

5. A Renewable Energy Certificate (REC) is equivalent to one megawatt-hour of electricity produced by a renewable energy resource. A REC represents the environmental and social benefits of renewable energy and can be sold separately from the electricity produced. RECs provide a second revenue stream for owners and a means for people to purchase the environmental and social benefits of renewable energy without purchasing the actual electricity.

6. Kentucky is currently a voluntary REC market as opposed to a compliance market. Compliance markets are created by a policy that exists in 29 states, plus the District of Columbia and Puerto Rico, called Renewable Portfolio Standard. In these states, electric companies are required to supply a certain percent of their electricity from renewable generators by a specified year. Renewable energy generators located in states that do not have a Renewable Portfolio Standard can sell their

Kentucky Power would be able to cover the costs of acquiring the energy through resale at this time. Godfrey further explained that while he believed the REPA was good for Kentucky Power and its customers, he had not attempted to quantify the overall benefits of this particular project.

### 2. KIUC's Evidence

KIUC presented three witnesses in opposition to Kentucky Power's application: (1) Lane Kohen, a utility rate and planning consultant holding the position of Vice President and Principal with the firm of Kennedy and Associates; (2) Paul Coomes, an Emeritus Professor of Economics at the University of Louisville, who also independently performs consulting work as an economist; and (3) Alan S. Taylor, the President of Sedway, Inc., a firm specializing in the economic and financial analysis of renewable and conventional power supply options and in providing independent evaluation services in utility solicitations for such resources.

### Lane Kohen

Ms. Lane Kohen testified that in her professional and expert opinion, the REPA is not necessary for Kentucky Power to continue to provide adequate, efficient and reasonable service to its customers. She explained that her opinion in this regard was based on the facts that: (1) there are no federal or state mandates requiring the use of renewable energy in Kentucky at the present time; (2) the additional generation was not needed for Kentucky Power to meet the needs of its customers; and (3) Kentucky Power failed to demonstrate that the proposed REPA was the least costly alternative compared to other available energy sources.

Ms. Kohen also testified that, in her opinion, Kentucky Power underestimated the affect the REPA would have on its credit rating. She explained that although the REPA will not require Kentucky Power to actually issue additional financing, the treatment by the credit rating agencies of the REPA as a debt equivalent will require Kentucky Power to increase its actual common equity by displacing or avoiding the issuance of lower cost debt in order to maintain its credit metrics.

### Paul Coomes

KIUC engaged Dr. Paul Coomes to provide an opinion on the likely regional economic consequences of the proposed biomass generation facility and the REPA. Dr. Coomes testified that after examining the data, he believes the REPA will result in a net loss to the regional economy. He explained that: "the associated rise in electricity rates from burning wood reduces the discretionary income of households in the region, and their reduced spending on goods and services decreases employment sufficiently to offset any job gains in logging, sawmills, and trucking." (R. at 1376). Dr. Coomes estimated that the increased utility rates residential consumers would pay would result in a $35 million loss to the local economy while the jobs and other benefits associated with the REPA would inject only $10-15 million into the economy. Thus, he believes approval of the REPA would have a 2-1 negative cost benefit on the regional economy.

### Alan S. Taylor

Mr. Alan Taylor believes that Kentucky Power can meet its goals of economic development and fuel diversity through other lower-cost opportunities. Taylor explained that renewable energy is becoming more affordable to acquire. He has seen "20-

RECs to voluntary buyers, usually at a cheaper price than compliance market RECs. See

https://emp.lbl.gov/sites/all/files/rps_summit_nov_2013.pdf.

year REPA proposals offered at contract prices that are less than a third of the ecoPower REPA's price." (R. at 1358). Taylor is very troubled by the fact that Kentucky Power did not solicit renewable energy proposals from other sources or at least perform an investigation into the range of costs associated with acquiring renewable energy. Taylor explained that without such information, the Commission has no basis for judging the cost-effectiveness of the ecoPower transaction.

### F. The Commission's Decision

On October 10, 2013, the Commission issued an Order approving the REPA, concluding that it satisfied the requirements of KRS 278.271. The Commission's Order provides:

> Because this case involves the application of KRS 278.271, our analysis must also fully consider the statutory mandates set forth in that statute.
>
> KRS 278.271 was enacted on March 5, 2013, and the instant matter represents a case of first impression for the Commission's consideration of KRS 278.271. Based upon our reading of KRS 278.271, the Commission finds that the statute has broadened our statutory authority when considering whether the costs associated with a purchase power agreement for the purchase of electric power from a certificated biomass energy facility are fair, just and reasonable. Historically, the Commission has applied a least-cost analysis in setting rates that are fair, just, and reasonable and in reviewing applications for certificates to construct utility facilities under KRS 278.020....
>
> However, KRS 278.271 expands the least-cost analysis to include the legislative policies set forth in KRS 154.27–020(2), i.e., the inducement of innovative energy-related business to be located in

Kentucky in order to achieve energy independence, create new jobs and new investments, and create new sources of tax revenues. Thus, in considering the proposed REPA in the case sub judice, the Commission must determine whether there is a need for the REPA and whether the cost of the REPA is reasonable in light of the legislative policies set forth in KRS 154.27–020(2).

> Having reviewed the record, and being otherwise sufficiently advised, the Commission finds that Kentucky Power has sufficiently established that there is a need for the REPA and that the REPA is fair, just, and reasonable as required under the recently established standard in KRS 278.271.
>
> The Commission also took note of President Obama's June 25, 2013 Climate Action Plan and Presidential Memorandum directing the Environmental Protection Agency to "...issue proposed carbon pollution standards, regulations, or guidelines, as appropriate, for modified, reconstructed, and existing power plants by no later than June 1, 2014."
>
> The proposed REPA would allow Kentucky Power to address its need to diversify its generating portfolio, and at the same time, it would promote biomass energy development in Kentucky, consistent with the policy directives set forth by Governor Beshear's 2008 Energy Plan and the Final Report on Biomass and Biofuels Development in Kentucky.
>
> The Commission further found that Kentucky Power has established that the REPA is fair, just, and reasonable in conformity with the requirements of KRS 278.271. While the Commission recognizes that the cost of the proposed REPA would not have withstood scrutiny based strictly on a least-cost analysis, our consideration of the REPA must

also take into account the policy mandates laid out in KRS 154.27–020(2).

We conclude that the REPA promotes the inducement of an innovative energy-related business located in Kentucky that would advance the public purposes of achieving energy independence, creating new jobs and new investment, and creating new sources of tax revenues. We note that the Biomass Facility would be the first of its kind in Kentucky and that the project would create 230 construction jobs, 30 full-time jobs at the facility, and 225 timber and trucking-related jobs. We further conclude that the economic benefits associated with the Biomass Facility in conjunction with the advancement of the expressed policy dictates set forth in KRS 154.27–020(2), as referenced in KRS 278.271, sufficiently justify a finding that the REPA is reasonable and should be approved.

On November 1, 2014, KIUC filed a Complaint with the Franklin Circuit Court pursuant to KRS 278.410 to vacate and set aside the Commission's Order. KIUC maintained that the Commission's Order violated KRS 278.271 because the Commission: 1) failed to make a finding that the "full costs" of the REPA over its "full term" are "fair, just and reasonable" as required by KRS 278.271; 2) failed to correctly apply the "fair, just, and reasonable" standard set forth in KRS 278.271; 3) misinterpreted KRS 278.271 by misconstruing the mandatory and permissive portions of that statute; and 4) based its conclusion that the REPA advanced the policy goals of KRS 154.27–020(2) on insufficient evidence.

On February 18, 2015, the Franklin Circuit Court issued an Opinion and Order affirming the Commission's Order. The Circuit Court's Order holds:

> Under the statute, the Commission is given broad authority to determine whether rates are "fair, just, and reasonable." In considering whether the full costs of the purchase power agreement over the full term of the agreement are "fair, just, and reasonable," the Commission may consider the policy in KRS 154.27–020(2)....
>
> After considering the policy in the statute, the Commission properly applied the policy to the requirements of KRS 278.271.
>
> The law with regard to the recovery of costs not recovered through the existing rates of the utility from a biomass power producer, does not require a finding that the proposals are the lowest cost. The Legislature has intended that the goals of energy independence, the creation of new jobs and new investment, and the creation of new streams of tax revenue may also be considered as part of the evaluation. The General Assembly has modified the Commission's review to promote these specific policy goals. The Commission's decision to approve the REPA after considering these policy goals is lawful.
>
> The Commission acted within its authority to approve the REPA. The Commission properly held, based on the evidentiary record, that the advancement of all the policy goals set forth in KRS 154.27–020(2) justify finding that the REPA is "fair, just, and reasonable." The Commission's decision was both lawful and reasonable.

This appeal followed.

## II. STANDARD OF REVIEW

Judicial review of orders issued by the Commission is governed by KRS 278.410(1). A court may vacate or set aside an order or determination by the Commission only where the Commission's decision is determined to be "unlawful or unreasonable." *See* KRS 278.410(1); *Citi-*

zens for Alt. Water Sol. v. Kentucky Pub. Serv. Comm'n, 358 S.W.3d 488, 489–90 (Ky.App.2011). The party seeking to set aside the Commission's determination has "the burden of proof to show by clear and satisfactory evidence that the [Commission's] determination, requirement, direction or order is unreasonable or unlawful." KRS 278.430.

A decision is considered "unlawful" if it violates a statute or constitutional provision. National–Southwire Aluminum Co. v. Big Rivers Elec. Corp., 785 S.W.2d 503 (Ky.App.1990); see also Public Serv. Comm'n v. Jackson Cnty. Rural Elec. Co-op., Inc., 50 S.W.3d 764 (Ky.App.2000). An order of the Commission "can be found unreasonable only if it is determined that the evidence presented leaves no room for difference of opinion among reasonable minds. In making such a review, the court is confined to a consideration of the evidence as presented in the record." Kentucky Indus. Util. Cust., Inc. v. Kentucky Util. Co., 983 S.W.2d 493, 499 (Ky.1998) (citing Energy Reg. Comm'n v. Kentucky Pwr., 605 S.W.2d 46 (Ky.App.1980)).

The Commission serves as factfinder and possesses sole discretion to judge the credibility of evidence. Energy Reg. Comm'n, 605 S.W.2d at 50. "The [Commission] acts as a quasi-judicial agency utilizing its authority to conduct hearings, render findings of fact and conclusions of law, and utilizing its expertise in the area and to the merits of rates and service issues." Simpson Cty. Water Dist. v. City of Franklin, 872 S.W.2d 460, 465 (Ky.1994).

Although KRS Chapter 278 grants the Commission sweeping authority to regulate public utilities, the Commission is a creature of statute and its powers are purely statutory, having only such powers as conferred expressly, by necessity, or by fair implication. Croke v. Pub. Serv. Comm'n of Kentucky, 573 S.W.2d 927 (Ky. App.1978). "Whether the [Commission] exceeded the scope of its authority is a question of law that we scrutinize closely and review de novo." Cincinnati Bell Tel. Co. v. Kentucky Pub. Serv. Comm'n, 223 S.W.3d 829, 836 (Ky.App.2007) (citing Commonwealth, Transp. Cab. v. Weinberg, 150 S.W.3d 75 (Ky.App.2004)). Finally, as always, we review questions of law de novo. City of Greenup v. Pub. Serv. Comm'n, 182 S.W.3d 535, 539 (Ky.App. 2005) (citing Revenue Cab. v. Comcast Cablevision of the South, 147 S.W.3d 743, 747 (Ky.App.2003)). With these standards in mind, we turn to the arguments presented.

## III. ANALYSIS

Kentucky Power, a retail electric supplier, has the "exclusive right to furnish retail electric service to all electric-consuming facilities located within its certified territory[.]" KRS 278.018. This right strips consumers of the right to price shop for the most affordable electric rates. Consumers of public utilities must rely on the Commission to protect them from unreasonable and unfair rates. "Because utilities are allowed to charge consumers only 'fair, just, and reasonable rates' under KRS 278.030(1), the [Commission] must ensure that utility rates are fair, just, and reasonable to discharge its duty under KRS 278.040 to ensure that utilities comply with state law." Kentucky Pub. Serv. Comm'n v. Com. ex rel. Conway, 324 S.W.3d 373, 377 (Ky.2010). In reviewing the Commission's rate approvals "[it is] the result reached rather than the method employed which is controlling." Id. (quoting National–Southwire, 785 S.W.2d at 510; citing Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)).

While the Commission has considerable discretion in fulfilling its statutory duty to insure that rates are fair, just and reasonable, its power is not unlimited. *Id.* at 381. "Just as a utility should not be denied a fair return on its investment properly included in rate base, so a customer or consumer should not be required to pay for investments made by the utility which are of no benefit to the consumer." *Nat'l–Southwire Aluminum Co.*, 785 S.W.2d at 518 (Wilhoit, Judge, concurring in part and dissenting in part). In essence then, the ultimate question in this case is whether Kentucky Power's customers are being required to pay for an investment by Kentucky Power that is of no benefit to them. Having reviewed the record, we are unable to identify any quantum of evidence to support the Commission's conclusion that the rate increases Kentucky Power requests permission to charge its customers are in any way fair, just and reasonable.

### A. Interpretation of KRS 278.271

The crux of this appeal concerns KRS 278.271, which specifically permits recovery of costs associated with purchasing power from "a biomass energy facility." The statute provides:

Notwithstanding any provision of law to the contrary, upon application by a regulated utility, the commission may allow recovery of costs which are not recovered in the existing rates of the utility for the purchase of electric power from a biomass energy facility that has received a certificate from the Kentucky State Board on Electric Generation and Transmission Siting pursuant to KRS 278.700 to 278.716. No recovery shall be allowed unless the full costs of the purchase power agreement over the full term of the agreement, which shall be included as part of the application, have been found by the commission to be fair, just, and reasonable. In determining whether the agreement is fair, just, and reasonable, the commission may consider the policy set forth by the General Assembly in KRS 154.27–020(2). The commission's approval of cost recovery under this section shall be valid for the entire initial term of the agreement.

*Id.*

Under this statute, the full costs of the purchase power agreement over the full term of the agreement must first be found by the Commission to be "fair, just, and reasonable" before such an agreement can be approved. Once secured, the Commission's approval is "valid for the entire initial term of the agreement." In considering whether the full costs of the purchase power agreement over the full term of the agreement are "fair, just, and reasonable," the Commission *may* consider the policy goals set forth in KRS 154.27–020(2), which states:

The General Assembly hereby finds and declares that it is in the best interest of the Commonwealth to induce the location of innovative energy-related businesses in the Commonwealth in order to advance the public purposes of achieving energy independence, creating new jobs and new investment, and creating new sources of tax revenues that but for the inducements to be offered by the authority to approved companies would not exist.

*Id.*

In examining KRS 278.271, "our foremost objective is to determine the legislature's intent, looking 'first to the language of the statute, giving the words their plain and ordinary meaning.'" *Overstreet v. Kindred Nursing Ctrs. Ltd. P'ship*, 479 S.W.3d 69, 73 (Ky.2015) (quoting *Richardson v. Louisville/Jefferson Cty. Metro Gov't*, 260 S.W.3d 777, 779 (Ky.2008)). If

the words chosen by the General Assembly "are clear, they are decisive." *Brewer v. Commonwealth*, 478 S.W.3d 363, 371 (Ky. 2015).

The statute states that no recovery "shall" be had under KRS 278.271 unless the Commission finds that "the full costs of the purchase power agreement over the full term of the agreement ... to be fair, just, and reasonable." It then goes on to state that in assessing whether the proposed agreement is fair, just, and reasonable, "the commission *may* consider the policy set forth by the General Assembly in KRS 154.27–020(2)." The words "shall" and "may" are both used in KRS 278.271. These words are of fundamental importance in understanding how the General Assembly meant for the Commission to apply KRS 278.271.

We agree with the Commission that the inclusion of KRS 154.27–020(2) in KRS 278.271 allows the Commission, at its *option*, to consider that one of the Commonwealth's goals is to offer incentives to induce "the location of innovative energy-related businesses in the Commonwealth." We also agree with the Commission that an agreement for biomass energy does not have to be the "least cost effective alternative" to be deemed fair, just and reasonable.

However, the fact that a contract is for the purchase of biomass energy does not make it, *per se*, reasonable. The statute is clear that the Commission must still assess the reasonableness of a proposed biomass agreement even if that agreement meets the goals of KRS 154.27–020(2). While the fact that an agreement meets the goals of KRS 154.27–020(2) is a factor the Commission *may* consider, it is not the determinative factor. Fairness, justness and reasonableness remain the determinative considerations.

An agreement which meets the goals of KRS 154.27–020(2) might be unreasonable if its costs are totally out of line with other projects that would also meet KRS 154.27–020(2)'s goals. Such an agreement might also be unreasonable if the energy is not currently necessary for the utility to meet the needs of its customers. By the same token, a renewable energy agreement that would cost customers more money than traditional energy could nonetheless be reasonable if it met the goals of KRS 154.27–020(2), was a reasonable cost in relation to other comparable forms of renewable energy, and was necessary for the utility to meet the needs of its customers.

We believe that the General Assembly's intent was for KRS 278.271 to inject another factor into the Commission's reasonableness calculus when dealing with biomass energy. We cannot accept that the General Assembly intended for the policy goals of KRS 154.27–020(2) to obviate the Commission's need to consider cost and necessity or to excuse a lack of evidence indicating that the agreement provides some benefit to the consumers that will ultimately bear its cost. Likewise, we do not believe the statutes should be construed as standing for the proposition that all contracts with "innovative energy-related businesses" will necessarily have a net benefit to the public in terms of job creation and the expansion of the tax base.

### B. Application of KRS 278.271

The following facts were established at the hearing: 1) Kentucky Power does not have a present need for the additional energy generated under the REPA that it cannot meet through other sources; 2) Kentucky Power currently has an approximately 3% energy reserve cushion; 3) Kentucky Power estimated that the energy it purchases under the REPA would add another 3% to its reserve cushion; 4) in the

first year, the average residential customer would experience a 5.9% to 7% rate increase; 5) in subsequent years, the rate increase could go as high as 13%; 6) the price under the REPA is high, even for renewable energy; and 7) Kentucky Power did not conduct any economic or cost-benefit analyses to determine whether the price at which it entered into for the REPA would be, in the long-term, economical.

While the Commission relied on the fact that the REPA would create some additional jobs in the region, only KIUC presented evidence concerning the actual effect the REPA would have on the economy. KIUC's evidence was that REPA would actually have a substantial negative net impact on the region's overall economy. Instead of relying on the evidence associated with this particular REPA and its net impact on the people of eastern Kentucky, the Commission cited President Obama's June 25, 2013, Climate Action Plan and Presidential Memorandum to the EPA regarding carbon emissions by power plants. The Commission also cited the EPA's Proposed Carbon Pollution Standard for New Power Plants, dated September 20, 2013, for the proposition that the REPA was in the best interest of Kentucky Power's customers because "it is necessary [as a result of EPA regulations] to investigate new sources of electricity generation in the Commonwealth of Kentucky." Finally, the Commission cited former Governor Steve Beshear's 2008 Energy Plan and the Final Report from the Executive Task Force on Biomass and Biofuels development in Kentucky to support the conclusion that the REPA was beneficial.

The Commission's discussion of the state and federal environmental policies in favor of biomass energy is approximately two pages long. After this discussion, the Commission then concludes that the REPA is "fair, just and reasonable" because it "promotes the inducement of an innovative energy-related business located in Kentucky that would advance the public purposes of achieving energy independence, creating new jobs and new investment and creating new sources of tax revenues." None of the Commission's findings relate specifically to the REPA at hand or the reasonableness and fairness of the substantial rate increase Kentucky Power's customers are being asked to bear over two decades for an additional 3% increased energy reserve.

Kentucky Power failed to put forth any evidence as to how the REPA compared to other renewable sources of energy or even other similar biomass contracts. It also failed to perform any analysis to estimate the reasonableness of the costs under the REPA for years two through twenty. In fact, there was no evidence put before the Commission that the REPA would result in a direct or indirect economic benefit for Kentucky Power's customers or the region as a whole.

While we agree that the statute provides the Commission with the authority to take policy goals into consideration, we cannot agree that substantial evidence supports the Commission's decision in this case. The decision rests on policy alone without any consideration whatsoever of the reasonableness of the rate increase proposed by Kentucky Power. The General Assembly's policies in favor of biomass energy are certainly entitled to consideration by the Commission, but it is clear those policies cannot trump all other factors. The Commission still has a duty to insure that the rate increase that is being imposed on customers is fair, just and reasonable. The proper application of the statute by the Commission in this case is of particular importance, because unlike other instances in which the Commission can subsequently modify or disallow recovery if the circum-

stances change, here, Commission approval of costs recovered under KRS 278.271 is **irrevocable.**

Given the irrevocable nature of Commission cost-recovery under KRS 278.271, the Legislature heightened the level of customer protection provided by the statute by mandating that the Commission ensure the "full costs" of a proposed biomass contract are "fair, just and reasonable" over its "full term." Notably, Kentucky Power failed to provide the Commission with evidence regarding the fair market value of electric power generated by the ecoPower facility in years two through twenty. Because the contract price is set to escalate by 2.25% each year from the original $50.7 million, the Commission could only calculate the total cost of the REPA, not whether the price was reasonable in comparison to available alternatives over its "full term" as required by the statute.

In *Nat'l–Southwire Aluminum Co. v. Big Rivers Elec. Corp.,* 785 S.W.2d 503, 510 (Ky.App.1990), we explained our role in overseeing the Commission's authority as related to utility rates. We explained that "[o]ur Court's role is also to insure that the conflicting interests of all parties concerned with utility rates are *fairly balanced.* If the PSC accomplishes this, we have no reason to substitute our judgment or reverse the PSC simply because it has failed to strictly adhere to the historical concept of "used and useful." *Id.* at 511.

The problem in this case is that the Commission failed to fairly balance the competing interests. Essentially, it approved the REPA on policy grounds alone. While the Commission was entitled to give some positive weight to the fact that this was a biomass facility, it was still required to consider other factors such as the reasonableness of the costs in comparison with other alternatives. While the statute *allows* the Commission to consider the pol-

icy objectives of KRS 154.27–020(2), it *mandates* that the Commission consider whether the full costs of the power agreement over the full term of the agreement are fair, just and reasonable. The Commission's failure to do so represents a complete abdication of its statutory responsibility to ensure that the rates for public utilities in this Commonwealth remain "fair, just and reasonable."

While the REPA would create a handful of regional jobs, almost every household and business in the twenty-county service area would be subjected to a sizable rate increase for the next twenty years. All told, the citizens of these twenty counties in eastern Kentucky, many who live at or below the poverty line, are being asked to fork out over a billion dollars so that Kentucky Power can diversify its energy portfolio in the event the EPA mandates renewable energy at some yet unknown future date. The evidence suggests that instead of improving the region's overall economic outlook, the REPA will actually strip away more jobs and money from the tax base than it will add. In no way, shape or form can we accept that the General Assembly intended the citizens of this Commonwealth to shoulder this type of burden. Given the facts, we must conclude that it was unreasonable for the Commission to approve Kentucky Power's application.

### IV. CONCLUSION

For these reasons, we REVERSE the Franklin Circuit Court and REMAND this case to the Commission with instructions to deny Kentucky Power's application for cost recovery.

ALL CONCUR.